# EASTEX, INC. *v.* NATIONAL LABOR RELATIONS BOARD

No. 77–453. Argued April 25, 1978—Decided June 22, 1978

Powell, J., delivered the opinion of the Court, in which Brennan, Stewart, White, Marshall, Blackmun, and Stevens, JJ., joined. White, J., filed a concurring opinion, *post,* p. 578. Rehnquist, J., filed a dissenting opinion, in which Burger, C. J., joined, *post,* p. 579.

*John B. Abercrombie* argued the cause for petitioner. With him on the brief was *Tom Martin Davis.*

*Richard A. Allen* argued the cause for respondent. With him on the brief were *Solicitor General McCree, John S. Irving, Carl L. Taylor, Norton J. Come, Linda Sher,* and *David S. Fishback.**

Mr. Justice Powell delivered the opinion of the Court.

Employees of petitioner sought to distribute a union newsletter in nonworking areas of petitioner's property during nonworking time urging employees to support the union and discussing a proposal to incorporate the state "right-to-work" statute into the state constitution and a Presidential veto of an increase in the federal minimum wage. The newsletter also called on employees to take action to protect their interests as employees with respect to these two issues. The question presented is whether petitioner's refusal to allow the distribution violated § 8 (a)(1) of the National Labor Relations Act, as amended, 61 Stat. 140, 29 U. S. C. § 158 (a)(1), by interfering with, restraining, or coercing employees' exercise of their right under § 7 of the Act, 29 U. S. C. § 157, to engage in "concerted activities for the purpose of . . . mutual aid or protection."

---

**William L. Keller* and *Stephen A. Bokat* filed a brief for the Chamber of Commerce of the United States as *amicus curiae* urging reversal.

# I

Petitioner is a company that manufactures paper products in Silsbee, Tex. Since 1954, petitioner's production employees have been represented by Local 801 of the United Paperworkers International Union. It appears that many, although not all, of petitioner's approximately 800 production employees are members of Local 801. Since Texas is a "right-to-work" State by statute,[1] Local 801 is barred from obtaining an agreement with petitioner requiring all production employees to become union members.

In March 1974, officers of Local 801, seeking to strengthen employee support for the union and perhaps recruit new members in anticipation of upcoming contract negotiations with petitioner, decided to distribute a union newsletter to petitioner's production employees.[2] The newsletter was divided into four sections. The first and fourth sections urged employees to support and participate in the union and, more generally, extolled the benefits of union solidarity. The second section encouraged employees to write their legislators to oppose incorporation of the state "right-to-work" statute into a revised state constitution then under consideration, warning that incorporation would "weake[n] Unions and improv[e] the edge business has at the bargaining table." The third section noted that the President recently had vetoed a bill to increase the federal minimum wage from $1.60 to $2.00 per hour, compared this action to the increase of prices and profits in the oil industry under administration policies, and admonished: "As working men and women we must defeat our enemies and

---

[1] Tex. Rev. Civ. Stat. Ann., Art. 5154g, § 1; Art. 5207a, § 2 (Vernon 1971).

[2] The president of Local 801 testified: "We were going into negotiations, and . . . we was [sic] trying to reorganize our group into a stronger group. We were trying to get members, people that were working there who were non-members, and try to motivate or strengthen the conviction of our members, and it was to organize a little." App. 11.

elect our friends. If you haven't registered to vote, please do so today."[3]

On March 26, 1974, Hugh Terry, an employee of petitioner and vice president of Local 801, asked Herbert George, petitioner's assistant personnel director, for permission to distribute the newsletter to employees in the "clock alley" that leads to petitioner's time clocks.[4] George doubted whether management would allow employees to "hand out propaganda like that," but agreed to check with his superiors. Leonard Menius, petitioner's personnel director, confirmed that petitioner would not allow employees to distribute the newsletter in clock alley. A few days later George communicated this decision to Terry, but gave no reasons for it.

On April 22, 1974, Boyd Young, president of Local 801,[5] together with Terry and another employee, asked George whether employees could distribute the newsletter in any nonworking areas of petitioner's property other than clock alley.[6] After conferring again with Menius, George reported

---

[3] The newsletter is reprinted in full as an appendix to this opinion.

[4] The Administrative Law Judge described "clock alley" as "a passageway 6 or 7 feet wide, flanked on either side by administrative offices. In addition to time clocks, the area contains an employee bulletin board and benches and chairs for those waiting to transact business in the offices. Clock alley is physically discrete from the production areas of the plant." 215 N. L. R. B. 271, 273 n. 7 (1974).

[5] Young, a longtime employee of petitioner, was on leave to serve as president of Local 801.

[6] Young testified that he had asked "permission for employees of the Company to be allowed to distribute this on non-working hours, on non-production areas, and specifically outside the clock alley; and if that area posed a problem, we would be willing to move to any area convenient to the Company, out on the end of the walk or guardhouse or parking lot, that we would only hand it out to employees leaving the plant, and where it wouldn't cause a litter problem in the plant." App. 8-9. The Administrative Law Judge credited Young's testimony that the request was only for employees to distribute the newsletter. 215 N. L. R. B., at 273 n. 9.

that employees would not be allowed to do so and that petitioner thought the union had other ways to communicate with employees. Local 801 then filed an unfair practice charge with the National Labor Relations Board (Board), alleging that petitioner's refusal to allow employees to distribute the newsletter in nonworking areas of petitioner's property during nonworking time interfered with, restrained, and coerced employees' exercise of their § 7 rights in violation of § 8 (a)(1).[7]

At a hearing on the charge, Menius testified that he had no objection to the first and fourth sections of the newsletter. He had denied permission to distribute the newsletter because he "didn't see any way in which [the second and third sections were] related to our association with the Union." App. 19. The Administrative Law Judge held that although not all of the newsletter had immediate bearing on the relationship between petitioner and Local 801, distribution of all its contents was protected under § 7 as concerted activity for the "mutual aid or protection" of employees. Because petitioner had presented no evidence of "special circumstances" to justify a ban on the distribution of protected matter by employees in nonworking areas during nonworking time, the Administrative Law Judge held that petitioner had violated § 8 (a)(1) and ordered petitioner to cease and desist from the violation.[8] The Board

---

[7] Section 8 (a)(1) makes it an unfair labor practice "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in" § 7 of the Act.

[8] Because no evidence of "special circumstances" had been presented, the Administrative Law Judge did not consider whether alternative channels of communication were available to Local 801. 215 N. L. R. B., at 275 n. 13. In the alternative, the judge held that even if distribution of the second and third sections of the newsletter was not protected by § 7, distribution of the newsletter as a whole was protected. Id., at 274, relying on Samsonite Corp., 206 N. L. R. B. 343 (1973).

The Administrative Law Judge also held that petitioner maintained an overbroad no-solicitation rule. 215 N. L. R. B., at 272. Petitioner did

affirmed the Administrative Law Judge's rulings, findings, and conclusions, and adopted his recommended order. 215 N. L. R. B. 271 (1974).

The Court of Appeals enforced the order. 550 F. 2d 198 (CA5 1977). It rejected petitioner's argument that the "mutual aid or protection" clause of § 7 protects only concerted activity by employees that is directed at conditions that their employer has the authority or power to change or control. Without expressing an opinion as to the full range of § 7 rights "when exercised off the employer's property," 550 F. 2d, at 202, the court purported to balance those rights against the employer's property rights and concluded that "whatever is reasonably related to the employees' *jobs* or to their status or condition as employees in the plant may be the subject of such handouts as we treat of here, distributed on the plant premises in such a manner as not to interfere with the work . . . ." *Id.*, at 203 (emphasis in original). The court further held that all of the material in the newsletter here met this test. *Id.*, at 204–205.[9]

Because of apparent differences among the Courts of Appeals as to the scope of rights protected by the "mutual aid or protection" clause of § 7, see n. 17, *infra,* we granted certiorari. 434 U. S. 1045 (1978). We affirm.

---

not rely on this rule in refusing to allow distribution of the newsletter, see *id.*, at 272 n. 4, and its validity was not an issue in the Court of Appeals, see 550 F. 2d 198, 201 n. 3 (CA5 1977). That rule is not before us. See Brief for Petitioner 5 n. 2.

[9] The court went on to disapprove the alternative ground for the Board's decision, see n. 8, *supra,* stating that "the presence of some § 7 protected material will not rescue that which is significantly not protected." 550 F. 2d, at 205. We do not find it necessary to express an opinion as to the correctness of this statement. In an opinion denying rehearing and rehearing en banc, the court reaffirmed that it had balanced the employer's and employees' rights, and it deleted two references in its first opinion to the First Amendment. 556 F. 2d 1280 (CA5 1977).

## II

Two distinct questions are presented. The first is whether, apart from the location of the activity, distribution of the newsletter is the kind of concerted activity that is protected from employer interference by §§ 7 and 8 (a)(1) of the National Labor Relations Act. If it is, then the second question is whether the fact that the activity takes place on petitioner's property gives rise to a countervailing interest that outweighs the exercise of § 7 rights in that location. See *Hudgens* v. *NLRB,* 424 U. S. 507, 521–523 (1976); *Central Hardware Co.* v. *NLRB,* 407 U. S. 539, 542–545 (1972); *NLRB* v. *Babcock & Wilcox Co.,* 351 U. S. 105, 112 (1956); *Republic Aviation Corp.* v. *NLRB,* 324 U. S. 793, 797–798 (1945). We address these questions in turn.

### A

Section 7 provides that "[e]mployees shall have the right . . . to engage in . . . concerted activities for the purpose of collective bargaining or other mutual aid or protection . . . ." [10] Petitioner contends that the activity here is not within the "mutual aid or protection" language because it does not relate to a "specific dispute" between employees and their own employer "over an issue which the employer has the right or power to affect." Brief for Petitioner 13. In support of its position, petitioner asserts that the term "employees" in § 7 refers only to employees of a particular employer, so that only activity by employees on behalf of themselves or other em-

---

[10] Section 7, as amended, as set forth in 29 U. S. C. § 157, states in full:

"Employees shall have the right to self-organize, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158 (a) (3) of this title [29]."

ployees of the same employer is protected. *Id.*, at 18, 24. Petitioner also argues that the term "collective bargaining" in § 7 "indicates a direct bargaining relationship whereas 'other mutual aid or protection' must refer to activities of a similar nature . . . ." *Id.*, at 24. Thus, in petitioner's view, under § 7 "the employee is only protected for activity within the scope of the employment relationship." *Id.*, at 13. Petitioner rejects the idea that § 7 might protect any activity that could be characterized as "political," and suggests that the discharge of an employee who engages in any such activity would not violate the Act.[11]

We believe that petitioner misconceives the reach of the "mutual aid or protection" clause. The "employees" who may engage in concerted activities for "mutual aid or protection" are defined by § 2 (3) of the Act, 29 U. S. C. § 152 (3), to "include any employee, and shall not be limited to the employees of a particular employer, unless this subchapter explicitly states otherwise . . . ." This definition was intended to protect employees when they engage in otherwise proper concerted activities in support of employees of employers other than their own.[12] In recognition of this intent, the Board and the courts long have held that the "mutual aid or protection" clause encompasses such activity.[13] Petitioner's

---

[11] See Tr. of Oral Arg. 17:

"QUESTION: [Suppose the] Union is banding together and they all want to oppose right-to-work laws, and they pass out literature out on the public street; and the employer says, 'I just don't like you fellows getting into this kind of business, I'm going to fire you.'

"Now, is that an unfair labor practice?

"MR. ABERCROMBIE: Your Honor, we would submit that it was not, that political activity is not protected under Section 7."

[12] See *Phelps Dodge Corp.* v. *NLRB*, 313 U. S. 177, 191–192 (1941); S. Rep. No. 573, 74th Cong., 1st Sess., 6 (1935); H. R. Rep. No. 1147, 74th Cong., 1st Sess., 9–10 (1935).

[13] *E. g.*, *Fort Wayne Corrugated Paper Co.* v. *NLRB*, 111 F. 2d 869, 874 (CA7 1940), enf'g *Cayuga Linen & Cotten Mills, Inc.*, 11 N. L. R. B. 1,

argument on this point ignores the language of the Act and its settled construction.

We also find no warrant for petitioner's view that employees lose their protection under the "mutual aid or protection" clause when they seek to improve terms and conditions of employment or otherwise improve their lot as employees through channels outside the immediate employee-employer relationship. The 74th Congress knew well enough that labor's cause often is advanced on fronts other than collective bargaining and grievance settlement within the immediate employment context. It recognized this fact by choosing, as the language of § 7 makes clear, to protect concerted activities for the somewhat broader purpose of "mutual aid or protection" as well as for the narrower purposes of "self-organization" and "collective bargaining." [14]  Thus, it has been held that the "mutual aid or

4–5 (1939) (right to assist in organizing another employer's employees); *NLRB* v. *J. G. Boswell Co.*, 136 F. 2d 585, 595 (CA9 1943), enf'g 35 N. L. R. B. 968 (1941) (right to express sympathy for striking employees of another employer); *Redwing Carriers, Inc.*, 137 N. L. R. B. 1545, 1546–1547 (1962), enf'd *sub nom. Teamsters* v. *NLRB*, 117 U. S. App. D. C. 84, 325 F. 2d 1011 (1963), cert. denied, 377 U. S. 905 (1964) (right to honor picket line of another employer's employees); *NLRB* v. *Alamo Express Co.*, 430 F. 2d 1032, 1036 (CA5 1970), cert. denied, 400 U. S. 1021 (1971), enf'g 170 N. L. R. B. 315 (1968) (accord); *Washington State Service Employees*, 188 N. L. R. B. 957, 959 (1971) (right to demonstrate in support of another employer's employees); *Yellow Cab, Inc.*, 210 N. L. R. B. 568, 569 (1974) (right to distribute literature in support of another employer's employees). We express no opinion, however, as to the correctness of the particular balance struck between employees' exercise of § 7 rights and employers' legitimate interests in any of the above-cited cases.

[14] Congress modeled the language of § 7 after that found in § 2 of the Norris-LaGuardia Act, 47 Stat. 70, 29 U. S. C. § 102, which declares that it is the public policy of the United States that workers "shall be free from the interference, restraint, or coercion of employers of labor, or their agents, in the designation of . . . representatives or in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aid or protection . . . ." See S. Rep. No. 573, 74th Cong., 1st

protection" clause protects employees from retaliation by their employers when they seek to improve working conditions through resort to administrative and judicial forums,[15] and that employees' appeals to legislators to protect their interests as employees are within the scope of this clause.[16] To hold that activity of this nature is entirely unprotected—irrespective of location or the means employed—would leave employees

---

Sess., 9 (1935); H. R. Rep. No. 1147, 74th Cong., 1st Sess., 15 (1935). This section of the Norris-LaGuardia Act expresses Congress' recognition of the "right of wage earners to organize and to act jointly in questions affecting wages, conditions of labor, *and the welfare of labor generally* . . . ." S. Rep. No. 163, 72d Cong., 1st Sess., 9 (1932) (emphasis supplied). Similar language is found in § 7 (a) (1) of the National Industrial Recovery Act of 1933, 48 Stat. 198; § 1 of the National Labor Relations Act, 49 Stat. 449, 29 U. S. C. § 151 (declaration of policy); and § 2 (a) of the Labor-Management Reporting and Disclosure Act of 1959, 73 Stat. 519, 29 U. S. C. § 401 (a) (findings, purposes, and policy).

[15] *E. g., Walls Mfg. Co.*, 137 N. L. R. B. 1317 (1962), enf'd, 116 U. S. App. D. C. 140, 321 F. 2d 753, cert. denied, 375 U. S. 923 (1963); *Socony Mobil Oil Co.*, 153 N. L. R. B. 1244 (1965), enf'd, 357 F. 2d 662 (CA2 1966); *Altex Ready Mixed Concrete Corp.* v. *NLRB*, 542 F. 2d 295, 297 (CA5 1976), enf'g 223 N. L. R. B. 696; *Wray Electric Contracting, Inc.*, 210 N. L. R. B. 757 (1974); *Alleluia Cushion Co.*, 221 N. L. R. B. 999 (1975); *King Soopers, Inc.*, 222 N. L. R. B. 1011 (1976); *Triangle Tool & Engineering, Inc.*, 226 N. L. R. B. 1354 (1976). We do not address here the question of what may constitute "concerted" activities in this context. Cf. *NLRB* v. *Weingarten, Inc.*, 420 U. S. 251, 260–261 (1975).

[16] *Bethlehem Shipbuilding Corp.* v. *NLRB*, 114 F. 2d 930, 937 (CA1 1940), dismissed on motion of petitioner, 312 U. S. 710 (1941), enf'g 11 N. L. R. B. 105 (1939); *NLRB* v. *Peter Cailler Kohler Swiss Chocolates Co.*, 130 F. 2d 503, 506 (CA2 1942) (dicta), enf'g 33 N. L. R. B. 1170 (1941); *Kaiser Engineers* v. *NLRB*, 538 F. 2d 1379, 1384–1385 (CA9 1976), enf'g 213 N. L. R. B. 752 (1974); cf. *Machinists* v. *Street*, 367 U. S. 740, 800–801, 812–816 (1961) (Frankfurter, J., dissenting). Other laws, however, may place limits on concerted activity in the legislative and political spheres. See *United States* v. *CIO*, 335 U. S. 106 (1948); *United States* v. *Auto Workers*, 352 U. S. 567 (1957); *Street, supra; Railway Clerks* v. *Allen*, 373 U. S. 113 (1963); *Pipefitters* v. *United States*, 407 U. S. 385 (1972); *Abood* v. *Detroit Bd. of Education.*, 431 U. S. 209 (1977).

open to retaliation for much legitimate activity that could improve their lot as employees. As this could "frustrate the policy of the Act to protect the right of workers to act together to better their working conditions," *NLRB* v. *Washington Aluminum Co.,* 370 U. S. 9, 14 (1962), we do not think that Congress could have intended the protection of § 7 to be as narrow as petitioner insists.[17]

It is true, of course; that some concerted activity bears a less immediate relationship to employees' interests as employees than other such activity. We may assume that at some point

---

[17] Petitioner relies upon several cases said to construe § 7 more narrowly than do we. *NLRB* v. *Leslie Metal Arts Co.,* 509 F. 2d 811 (CA6 1975), and *Shelly & Anderson Furniture Mfg. Co.* v. *NLRB,* 497 F. 2d 1200 (CA9 1974), both quote the same treatise for the proposition that to be protected under § 7, concerted activity must seek "a specific remedy" for a "work-related complaint or grievance." 509 F. 2d, at 813, and 497 F. 2d, at 1202–1203, quoting 18B T. Kheel, Labor Law § 10.02 [3], pp. 10–21 (1973). It was unnecessary in those cases to decide whether the protection of § 7 went beyond the treatise's formulation, for the activity in both cases was held to be protected. Moreover, in stating its "rule," the treatise relied upon takes no note of the cases cited in nn. 13, 15, and 16, *supra.* Cf. R. Gorman, Labor Law 296–302 (1976). The Courts of Appeals for the Sixth and Ninth Circuits themselves have taken a broader view of the "mutual aid or protection" clause than the reference to the treatise in the above-cited cases would seem to suggest. See, *e. g., Kellogg Co.* v. *NLRB,* 457 F. 2d 519, 522–523 (CA6 1972), and cases there cited; *Kaiser Engineers* v. *NLRB, supra,* at 1384–1385.

Similarly, although the Court of Appeals for the Fourth Circuit stated in *NLRB* v. *Bretz Fuel Co.,* 210 F. 2d 392 (1954), that "concerted activity is protected only where such activity is intimately connected with the employees' immediate employment," *id.,* at 396, the holding in that case turned more on the fact that the activity there consisted of a wildcat strike in violation of a collective-bargaining agreement than on a narrow view of the "mutual aid or protection" clause. See *id.,* at 397–398.

This leaves only *G&W Electric Specialty Co.* v. *NLRB,* 360 F. 2d 873 (CA7 1966), which refused to enforce a Board order because the concerted activity there—circulation of a petition concerning management of an employee-run credit union—"involved no request for any action upon the part of the Company and did not concern a matter over which the Com-

the relationship becomes so attenuated that an activity cannot fairly be deemed to come within the "mutual aid or protection" clause. It is neither necessary nor appropriate, however, for us to attempt to delineate precisely the boundaries of the "mutual aid or protection" clause. That task is for the Board to perform in the first instance as it considers the wide variety of cases that come before it.[18] *Republic Aviation Corp.* v. *NLRB*, 324 U. S., at 798; *Phelps Dodge Corp.* v. *NLRB*, 313 U. S. 177, 194 (1941). To decide this case, it is enough to determine whether the Board erred in holding that distribution of the second and third sections of the newsletter is for the purpose of "mutual aid or protection."

---

pany had control." *Id.*, at 876. *G&W Electric* cites no authority for its narrowing of § 7, and it ignores a substantial weight of authority to the contrary, including the Seventh Circuit's own prior holding in *Fort Wayne Corrugated Paper Co.* v. *NLRB*, 111 F. 2d, at 874. See n. 13, *supra.* We therefore do not view any of these cases as persuasive authority for petitioner's position.

[18] See *Ford Motor Co.*, 221 N. L. R. B. 663, 666 (1975), enf'd, 546 F. 2d 418 (CA3 1976) (holding distribution on employer's premises of a "purely political tract" unprotected even though "the election of any political candidate may have an ultimate effect on employment conditions"); cf. *Ford Motor Co. (Rouge Complex)*, 233 N. L. R. B. 698, 705 (1977) (decision of Administrative Law Judge) (concession of General Counsel that distributions on employer's premises of literature urging participation in Revolutionary Communist Party celebration, and of Party's newspaper, were unprotected). The Board has not yet made clear whether it considers distributions like those in the above-cited cases to be unprotected altogether, or only on the employer's premises.

In addition, even when concerted activity comes within the scope of the "mutual aid or protection" clause, the forms such activity permissibly may take may well depend on the object of the activity. "The argument that the employer's lack of interest or control affords a legitimate basis for holding that a subject does not come within 'mutual aid or protection' is unconvincing. The argument that economic pressure should be unprotected in such cases is more convincing." Getman, The Protection of Economic Pressure by Section 7 of the National Labor Relations Act, 115 U. Pa. L. Rev. 1195, 1221 (1967).

The Board determined that distribution of the second section, urging employees to write their legislators to oppose incorporation of the state "right-to-work" statute into a revised state constitution, was protected because union security is "central to the union concept of strength through solidarity" and "a mandatory subject of bargaining in other than right-to-work states." 215 N. L. R. B., at 274. The newsletter warned that incorporation could affect employees adversely "by weakening Unions and improving the edge business has at the bargaining table." The fact that Texas already has a "right-to-work" statute does not render employees' interest in this matter any less strong, for, as the Court of Appeals noted, it is "one thing to face a statutory scheme which is open to legislative modification or repeal" and "quite another thing to face the prospect that such a scheme will be frozen in a concrete constitutional mandate." 550 F. 2d, at 205. We cannot say that the Board erred in holding that this section of the newsletter bears such a relation to employees' interests as to come within the guarantee of the "mutual aid or protection" clause. See cases cited in n. 16, *supra.*

The Board held that distribution of the third section, criticizing a Presidential veto of an increase in the federal minimum wage and urging employees to register to vote to "defeat our enemies and elect our friends," was protected despite the fact that petitioner's employees were paid more than the vetoed minimum wage. It reasoned that the "minimum wage inevitably influences wage levels derived from collective bargaining, even those far above the minimum," and that "concern by [petitioner's] employees for the plight of other employees might gain support for them at some future time when they might have a dispute with their employer." 215 N. L. R. B., at 274 (internal quotation marks omitted). We think that the Board acted within the range of its discretion in so holding. Few topics are of such immediate concern to employees as the level of their wages. The Board was

entitled to note the widely recognized impact that a rise in the minimum wage may have on the level of negotiated wages generally,[19] a phenomenon that would not have been lost on petitioner's employees. The union's call, in the circumstances of this case, for these employees to back persons who support an increase in the minimum wage, and to oppose those who oppose it, fairly is characterized as concerted activity for the "mutual aid or protection" of petitioner's employees and of employees generally.

In sum, we hold that distribution of both the second and the third sections of the newsletter is protected under the "mutual aid or protection" clause of § 7.[20]

## B

The question that remains is whether the Board erred in holding that petitioner's employees may distribute the newsletter in nonworking areas of petitioner's property during nonworking time. Consideration of this issue must begin with the Court's decisions in *Republic Aviation Corp.* v. *NLRB, supra,* and *NLRB* v. *Babcock & Wilcox Co.,* 351 U. S. 105 (1956). In *Republic Aviation* the Court upheld the Board's ruling that an employer may not prohibit its employees from

---

[19] See N. Chamberlain, Labor 435–437 (1958); L. Reynolds, Labor Economics and Labor Relations 272 (5th ed. 1970).

[20] Petitioner argues that the "right to work" and minimum wage issues are "political," and that advancing a union's political views is not protected by § 7. As almost every issue can be viewed by some as political, the clear purpose of the "mutual aid or protection" clause would be frustrated if the mere characterization of conduct or speech removed it from the protection of the Act. See cases cited in n. 16, *supra.* Moreover, what may be viewed as political in one context can be viewed quite differently in another. There may well be types of conduct or speech that are so purely political or so remotely connected to the concerns of employees as employees as to be beyond the protection of the clause. But this is a determination that should be left for case-by-case consideration. Cf. cases cited in n. 18, *supra.*

distributing union organizational literature in nonworking areas of its industrial property during nonworking time, absent a showing by the employer that a ban is necessary to maintain plant discipline or production. This ruling obtained even though the employees had not shown that distribution off the employer's property would be ineffective. 324 U. S., at 798–799, 801. In the Court's view, the Board had reached an acceptable "adjustment between the undisputed right of self-organization assured to employees under the Wagner Act and the equally undisputed right of employers to maintain discipline in their establishments." *Id.,* at 797–798.[21]

In *Babcock & Wilcox,* on the other hand, nonemployees sought to enter an employer's property to distribute union organizational literature. The Board applied the rule of *Republic Aviation* in this situation, but the Court held that there is a distinction "of substance" between "rules of law applicable to employees and those applicable to nonemployees." 351 U. S., at 113. The difference was that the nonemployees in *Babcock & Wilcox* sought to trespass on the employer's property, whereas the employees in *Republic Aviation* did not. Striking a balance between § 7 organizational rights and an employer's right to keep strangers from entering on its property, the Court held that the employer in *Babcock & Wilcox* was entitled to prevent "nonemployee distribution of union literature [on its property] if reasonable efforts by the union through other available channels of communication will enable it to reach the employees with its message . . . ." *Id.,* at 112. The Court recently has emphasized the distinction between the two cases: "A wholly different balance was

---

[21] In *Republic Aviation* the Court also upheld Board rulings that employees may solicit other employees to join a union on the employer's property during nonworking time, and may wear union insignia on the employer's property. The Board since has distinguished between distributions of literature and oral solicitation, holding that the latter but not the former may take place in working areas during nonworking time. *Stoddard-Quirk Mfg. Co.,* 138 N. L. R. B. 615 (1962).

struck when the organizational activity was carried on by employees already rightfully on the employer's property, since the employer's management interests rather than his property interests were there involved." *Hudgens* v. *NLRB,* 424 U. S., at 521–522, n. 10; see also *Central Hardware Co.* v. *NLRB,* 407 U. S., at 543–545.

It is apparent that the instant case resembles *Republic Aviation* rather closely. Here, as there, employees sought to distribute literature in nonworking areas of their employer's industrial property during nonworking time. Here, as there, the employer has not attempted to show that distribution would interfere with plant discipline or production. And here, as there, distribution of the newsletter clearly would be protected by § 7 against employer discipline if it took place off the employer's property. The only possible ground of distinction is that part of the newsletter in this case does not address purely organizational matters, but rather concerns other activity protected by § 7. The question, then, is whether this difference required the Board to apply a different rule here than it applied in *Republic Aviation.*

Petitioner contends that the Board must distinguish among distributions of protected matter by employees on an employer's property on the basis of the content of each distribution. Echoing its earlier argument, petitioner urges that the *Republic Aviation* rule should not be applied if a distribution "does not involve a request for any action on the part of the employer, or does not concern a matter over which the employer has any degree of control . . . ." Brief for Petitioner 28. In petitioner's view, distribution of any other matter protected by § 7 would be an "unnecessary intrusio[n] on the employer's property rights," *id.,* at 29, in the absence of a showing by employees that no alternative channels of communication with fellow employees are available.

We hold that the Board was not required to adopt this view in the case at hand. In the first place, petitioner's reliance on

its property right is largely misplaced. Here, as in *Republic Aviation,* petitioner's employees are "already rightfully on the employer's property," so that in the context of this case it is the "employer's management interests rather than [its] property interests" that primarily are implicated. *Hudgens, supra,* at 521–522, n. 10. As already noted, petitioner made no attempt to show that its management interests would be prejudiced in any way by the exercise of § 7 rights proposed by its employees here. Even if the mere distribution by employees of material protected by § 7 can be said to intrude on petitioner's property rights in any meaningful sense, the degree of intrusion does not vary with the content of the material. Petitioner's only cognizable property right in this respect is in preventing employees from bringing literature onto its property and distributing it there—not in choosing which distributions protected by § 7 it wishes to suppress.[22]

On the other side of the balance, it may be argued that the employees' interest in distributing literature that deals with matters affecting them as employees, but not with self-organization or collective bargaining, is so removed from the central concerns of the Act as to justify application of a different rule than in *Republic Aviation.* Although such an argument may have force in some circumstances, see *Hudgens, supra,* at 522, the Board to date generally has chosen not to engage in such refinement of its rules regarding the distribution

---

[22] In addition, we doubt whether the test proposed by petitioner for the protection of its property rights can be squared with *Republic Aviation* itself, for the organizational literature in that case did not "involve a request for any action on the part of the employer, or . . . concern a matter over which the employer [had] any degree of control."

To be sure, if the material distributed on the premises of the employer were inflammatory to the point of threatening disorder or other interruption of the normal functioning of the business, the exception noted in *Republic Aviation* with respect to interference with discipline or production would be fully applicable. See *Procter & Gamble Mfg. Co.,* 160 N. L. R. B. 334, 395 (1966).

of literature by employees during nonworking time in non-working areas of their employers' property. We are not prepared to say in this case that the Board erred in the view it took.

It is apparent that the complexity of the Board's rules and the difficulty of the Board's task might be compounded greatly if it were required to distinguish not only between literature that is within and without the protection of § 7, but also among subcategories of literature within that protection. In addition, whatever the strength of the employees' § 7 interest in distributing particular literature, the Board is entitled to view the intrusion by employees on the property rights of their employer as quite limited in this context as long as the employer's management interests are adequately protected. The Board also properly may take into account the fact that the plant is a particularly appropriate place for the distribution of § 7 material, because it "is the one place where [employees] clearly share common interests and where they traditionally seek to persuade fellow workers in matters affecting their union organizational life and other matters related to their status as employees." *Gale Products,* 142 N. L. R. B. 1246, 1249 (1963).

We need not go so far in this case, however, as to hold that the *Republic Aviation* rule properly is applied to every in-plant distribution of literature that falls within the protective ambit of § 7. This is a new area for the Board and the courts which has not yet received mature consideration.[23] It may be that the

---

[23] In addition to the instant case, the Board has extended the rule of *Republic Aviation* to a limited extent to encompass nonorganizational literature complaining about an incumbent union's leadership or bargaining position. *Samsonite Corp.,* 206 N. L. R. B. 343 (1973); *McDonnell Douglas Corp.,* 210 N. L. R. B. 280 (1974); *General Motors Corp.,* 212 N. L. R. B. 133 (1974); *The Singer Co.,* 220 N. L. R. B. 1179 (1975); *Ford Motor Co.,* 221 N. L. R. B. 663 (1975), enf'd, 546 F. 2d 418 (CA3 1976). In one case it applied the rule to literature exhorting employees

"nature of the problem, as revealed by unfolding variant situations," requires "an evolutionary process for its rational response, not a quick, definitive formula as a comprehensive answer." *Electrical Workers* v. *NLRB,* 366 U. S. 667, 674 (1961). For this reason, we confine our holding to the facts of this case.

Petitioner concedes that its employees were entitled to distribute a substantial portion of this newsletter on its property. In addition, as we have held above, the sections to which petitioner objected concern activity which petitioner, in the absence of a countervailing interest of its own, is not entitled to suppress. Yet petitioner made no attempt to show that its management interests would be prejudiced in any manner by distribution of these sections, and in our view any incremental intrusion on petitioner's property rights from their distribution together with the other sections would be minimal. Moreover, it is undisputed that the union undertook the distribution in order to boost its support and improve its bargaining position in upcoming contract negotiations with petitioner. Thus, viewed in context, the distribution was closely tied to vital concerns of the Act.[24] In these circum-

---

"to support employees of other employers who were on strike and to oppose an alleged antilabor combination." *Yellow Cab, Inc.,* 210 N. L. R. B., at 569. On the other hand, it has not allowed distribution of "purely political" material on employers' premises, even when the material might arguably be within the scope of § 7. See n. 18, *supra.* This Court already has approved the Board's limited extension of the *Republic Aviation* rule to cover the distribution of literature by dissident employees advocating the displacement of a union. See *NLRB* v. *Magnavox Co.,* 415 U. S. 322 (1974); *id.,* at 327 (STEWART, J., concurring in part and dissenting in part).

[24] As we have had occasion to state: "Unions have a legitimate and substantial interest in continuing organizational efforts after recognition. Whether the goal is merely to strengthen or preserve the union's majority, or is to achieve 100% employee membership—a particularly substantial union concern where union security agreements are not permitted, as they are not here . . .—these organizing efforts are equally entitled to the

576

stances, we hold that the Board did not err in applying the *Republic Aviation* rule to the facts of this case. The judgment of the Court of Appeals therefore is

*Affirmed.*

## APPENDIX TO OPINION OF THE COURT

### NEWS BULLETIN TO LOCAL 801 MEMBERS FROM BOYD YOUNG—PRESIDENT
### WE NEED YOU

As a member, we need you to help build the Union through your support and understanding. Too often members become disinterested and look upon their Union as being something separate from themselves. Nothing could be further from the truth.

This Union or any Union will only be as good as the members make it. The policies and practices of this Union are made by the membership—*the active membership.* If this Union has ever missed its target it may be because not enough members made their views known where the final decisions are made— The Union Meeting.

It would be impossible to satisfy everyone with the decisions that are made but the active member has the opportunity to bring the majority around to his way of thinking. This is how a democratic organization works and it's the best system around.

Through participation you can make your voice felt not only in this Local but throughout the International Union.

### A PHONY LABEL—*"right to work"*

Wages are determined at the bargaining table and the stronger the Union, the better the opportunity for improvements. The "right to work" law is simply an attempt to weaken the strength of Unions. The misleading title of

protection of § 7 . . . ." *Letter Carriers* v. *Austin,* 418 U. S. 264, 279 (1974).

"right to work" cannot guarantee anyone a job. It simply weakens the negotiating power of Unions by outlawing provisions in contracts for Union shops, agency shops, and modified Union shops. These laws do not improve wages or working conditions but just protect free riders. Free riders are people who take all the benefits of Unions without paying dues. They ride on the dues that members pay to build an organization to protect their rights and improve their way of life. At this time there is a very well organized and financed attempt to place the "right to work" law in our new state constitution. This drive is supported and financed by big business, namely, the National Right-To-Work Committee and the National Chamber of Commerce. If their attempt is successful, it will more than pay for itself by weakening Unions and improving the edge business has at the bargaining table. States that have no "right-to-work" law consistently have higher wages and better working conditions. Texas is well known for its weak laws concerning the working class and the "right-to-work" law would only add insult to injury. If you fail to take action against the "right-to-work" law it may well show up in wages negotiated in the future. I urge every member to write their state congressman and senator in protest of the "right-to-work" law being incorporated into the state constitution. Write your state representative and state senator and let the delegate know how you feel.

POLITICS AND INFLATION

The Minimum Wage Bill, HR 7935, was vetoed by President Nixon. The President termed the bill as inflationary. The bill would raise the present $1.60 to $2.00 per hour for most covered workers.

It seems almost unbelievable that the President could term $2.00 per hour as inflationary and at the same time remain silent about oil companies profits ranging from 56% to 280%.

It also seems disturbing, that after the price of gasoline has increased to over 50 cents a gallon, that the fuel crisis is

beginning to disappear. If the price of gasoline ever reaches 70 cents a gallon you probably couldn't find a closed filling station or empty pump in the Northern Hemisphere.

Congress is now pr[o]ceeding with a second minimum wage bill that hopefully the President will sign into law. At $1.60 per hour you could work 40 hours a week, 52 weeks a year and never earn enough money to support a family.

As working men and women we must defeat our enemies and elect our friends. If you haven't registered to vote, please do so today.

FOOD FOR THOUGHT

In Union there is strength, justice, and moderation;
In disunion, nothing but an alternating humility and insolence.

COMING TOGETHER WAS A BEGINNING
STAYING TOGETHER IS PROGRESS
WORKING TOGETHER MEANS SUCCESS
THE PERSON WHO STANDS NEUTRAL, STANDS
    FOR NOTHING!

Mr. Justice White, concurring.

As I understand the record in this case, the only issue before the Administrative Law Judge and before the Board was whether the activity engaged in here by the employees was the kind of activity protected by § 7 of the National Labor Relations Act. The Administrative Law Judge held that the circulars were related to matters encompassed by § 7 and noted that there had been no attempt or evidence to show that even though the distributions were § 7 activity, there were nevertheless circumstances that permitted the employer to forbid the distributions on his property. The Board adopted the report of the Administrative Law Judge.

I agree that the employees here were engaged in activity protected by § 7, at least in the sense that the employer could not discharge employees for propagandizing their fellow workers with materials concerning minimum wages and right-to-

work laws, so long as the distribution takes place off the employer's property. I agree further that under current law and the facts and claims in this record, the distributions could take place on the employer's property. Accordingly, the Board was entitled to have its order enforced and I join the judgment and opinion of the Court.

In doing so, I should say that it is not easy to explain why an employer need permit his property to be used for distributions about subjects unrelated to his relationship with his employees simply because it is convenient for the latter to use his property in this manner and simply because there is no interference with "management interests." Ownership of property normally confers the right to control the use of that property. Here there was no finding by the Board that the literature sought to be distributed was connected with the bargaining relationship; and I doubt that federal law requires the employer *always* to permit his property to be used for solicitations and distributions having § 7 protection, even by and among employees in nonworking areas and during nonworking times. Such distributions might concern goals and ends about which his work force, considered as a whole, as well as the public, may be deeply divided, with which he may have no sympathy whatsoever, or in connection with which he would not care to have it inferred that he supports one side or the other. All of these, if substantiated by the record, would appear to be substantial factors to be weighed in the balance when determining whether the employer has violated the Labor Act's strictures concerning his relationship with his employees.

However this may be, on the record before us, I am content to affirm the judgment of the Court of Appeals.

Mr. Justice Rehnquist, with whom The Chief Justice joins, dissenting.

It is not necessary to determine the scope of the "mutual aid or protection" language of § 7 of the National Labor Rela-

tions Act to conclude that Congress never intended to require the opening of private property to the sort of political advocacy involved in this case. Petitioner's right as a property owner to prescribe the conditions under which strangers may enter its property is fully recognized under Texas law. " 'A licensee who goes beyond the rights and privileges granted by the license becomes a trespasser.' " *Burton Construction & Shipbuilding Co.* v. *Broussard,* 154 Tex. 50, 58, 273 S. W. 2d 598, 603 (1954) (citation omitted). See also *Brown* v. *Dellinger,* 355 S. W. 2d 742 (Tex. Civ. App. 1962); 56 Tex. Jur. 2d, Trespass § 4 (1964). Thus, the employees' effort to distribute their leaflet in defiance of petitioner's wishes would clearly be a trespass infringing upon petitioner's property right. There is no indication that Texas takes so narrow a view of petitioner's rights that it may fairly be said that its "only cognizable property right in this respect is in preventing employees from bringing literature onto its property and distributing it there." *Ante,* at 573. So far as appears, a Texas property owner may admit certain leaflets onto his property and exclude others, as it pleases him. The Court can only mean that the Board need not take cognizance of any greater property right because the Congress has clearly and constitutionally said so.

From its earliest cases construing the National Labor Relations Act the Court has recognized the weight of an employer's property rights, rights which are explicitly protected from federal interference by the Fifth Amendment to the Constitution. The Court has not been quick to conclude in a given instance that Congress has authorized the displacement of those rights by the federally created rights of the employees. In *NLRB* v. *Fansteel Metallurgical Corp.,* 306 U. S. 240 (1939), construing another section of the Act, this Court dealt with the Board's efforts to compel the reinstatement of employees who had been discharged after violating their

employer's property rights by engaging in a sitdown strike. Mr. Chief Justice Hughes wrote for the Court:

> "We are unable to conclude that Congress intended to compel employers to retain persons in their employ regardless of their unlawful conduct,—to invest those who go on strike with an immunity from discharge for acts of trespass or violence against the employer's property, which they would not have enjoyed had they remained at work. Apart from the question of the constitutional validity of an enactment of that sort, it is enough to say that such legislative intention should be found in some definite and unmistakable expression. We find no such expression in the cited provision." *Id.,* at 255.

See also *id.,* at 265 (Stone, J., concurring in part). An employer's property rights must give way only where necessary to effectuate the central purposes of the Act: "to safeguard the rights of self-organization and collective bargaining, and thus by the promotion of industrial peace to remove obstructions to the free flow of commerce as defined in the Act." *Id.,* at 257.

Those rights of self-organization were again recognized six years later in *Republic Aviation Corp.* v. *NLRB,* 324 U. S. 793 (1945). There, the Court held that Congress had authorized the Board to displace the property rights of employers where necessary to accommodate the rights of employees to distribute union organizational literature and to wear union insignia. In *NLRB* v. *Babcock & Wilcox Co.,* 351 U. S. 105 (1956), the Court recognized that nonemployees could also invoke this right to solicit union membership, but it held that the Board's authority to displace the employer's property rights in such circumstances was extremely limited.[1] Later,

---

[1] The Court's assertion to the contrary notwithstanding, both *Babcock* and *Republic Aviation,* like this case, involved a "trespass on the employer's property," *ante,* at 571, in that union members sought to over-

the Court in *Central Hardware Co.* v. *NLRB,* 407 U. S. 539 (1972), explained the limited nature of the intrusion upon property rights permitted by *Babcock:*

> "The principle of *Babcock* is limited to this accommodation between organization rights and property rights. This principle requires a 'yielding' of property rights only in the context of an organization campaign. Moreover, the allowed intrusion on property rights is limited to that necessary to facilitate the exercise of employees' § 7 rights. After the requisite need for access to the employer's property has been shown, the access is limited to (i) union organizers; (ii) prescribed nonworking areas of the employer's premises; and (iii) the duration of organization activity. In short, the principle of accommodation announced in *Babcock* is limited to labor organization campaigns and the 'yielding' of property rights it may require is both temporary and minimal." 407 U. S., at 544–545.[2]

---

ride the employer's right to prescribe the conditions of entry to its property. It cannot accept the implications of the dictum in *Hudgens* v. *NLRB,* 424 U. S. 507, 521–522, n. 10 (1976), which may in turn be traced back to that portion of the Board's opinion quoted in *Republic Aviation,* 324 U. S., at 803–804, n. 10, that this constitutionally protected right may be disregarded where employees are involved simply by characterizing it as a "management interes[t]." The employer has a property right under Texas law to decide not only who shall come on his property but also the conditions which must be complied with to remain there. The fact that this right may be subordinated by various governmental enactments makes it no less a property right.

[2] I do not read the reference in *Central Hardware* to "§ 7 rights" as a suggestion that all rights protected under that section may be allowed to intrude upon an employer's property rights. The rest of the paragraph clearly limits its application to organization rights, and the Court in a later case suggested that distinctions might be drawn between "lawful economic strike activity" and "organizational activity," both of which are protected rights under § 7. *Hudgens* v. *NLRB, supra,* at 522. Earlier this Term, in *Sears, Roebuck & Co.* v. *Carpenters,* 436 U. S. 180 (1978), the Court

The Court today cites no case in which it has ever held that anyone, whether an employee or a nonemployee, has a protected right to engage in anything other than organizational activity on an employer's property. The simple question before us is whether Congress has authorized the Board to displace an employer's right to prevent the distribution on his property of political material concerning matters over which he has no control.[3] In eschewing any analysis of this question, in deference to the supposed expertise of the Board, the Court permits a " 'yielding' of property rights" which is certainly not "temporary"; and I cannot conclude that the deprivation of such a right of property can be dismissed as "minimal." It may be that Congress has power under the Commerce Clause to require an employer to open his property to such political advocacy, but, if Congress intended to do so, "such a legislative intention should be found in some definite and unmistakable expression." *Fansteel*, 306 U. S., at 255. Finding no such expression in the Act, I would not permit the Board to balance away petitioner's right to exclude political literature from its property.

I would reverse the judgment of the Court of Appeals.

---

conceded that trespassory picketing might be protected in some circumstances, but went on to state: "Even on the assumption that picketing to enforce area standards is entitled to the same deference in the *Babcock* accommodation analysis as organizational solicitation, it would be unprotected in most instances." *Id.*, at 206 (footnote omitted). No holding of this Court has ever found such a trespass protected.

[3] The Court's complaint that "almost every issue can be viewed by some as political," *ante*, at 570 n. 20, contrasts markedly with its earlier assurance, in another context, that "common-sense" distinctions may be drawn between political speech and commercial speech. *Ohralik* v. *Ohio State Bar Assn.*, 436 U. S. 447, 455–456 (1978). In any case, there is little difficulty in determining whether the employer has the power to affect those matters of which his employees complain. Where he does not, there is no reason to require him to permit such advocacy on his property, even though such activity might arguably be protected under § 7 if committed elsewhere.