**LOCAL 174, INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA, (UAW), Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent,**

**Firestone Steel Products Company, Intervenor.**

**No. 79–2539.**

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 2, 1981.

Decided March 3, 1981.

Alan V. Reuther, Detroit, Mich., with whom John A. Fillion and M. Jay Whitman, Detroit, Mich., were on the brief, for petitioner. Claude D. Montgomery and Judith A. Scott, Detroit, Mich., also entered an appearance for petitioner.

Paul J. Spielberg, Deputy Asst. Gen. Counsel, N. L. R. B., Washington, D. C., with whom Elliott Moore, Deputy Associate Gen. Counsel, and Morton Namrow, Atty., N. L. R. B., Washington, D. C., were on the brief, for respondent.

Teresa M. Holland, Washington, D. C., with whom Andrew M. Kramer, Washington, D. C., was on the brief, for intervenor, Firestone Steel Products Co.

Before PECK,[*] Senior Circuit Judge for the United States Court of Appeals for the Sixth Circuit, MacKINNON and GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge GINSBURG.

GINSBURG, Circuit Judge:

The National Labor Relations Board decided that a leaflet Local 174 ("the Union") sought to distribute was primarily a "political tract" and not a measure for the "mutual aid or protection" of employees within the meaning of § 7 of the National Labor Relations Act, 29 U.S.C. § 157 (1976). It therefore held that Firestone ("the Company") committed no unfair labor practice in refusing to allow union members to distribute the leaflet during nonworking time in nonworking areas of the Company's premises. We agree with the Union that the Board's method of adjudication in this case was intolerably abrupt. Nevertheless, we deny the Union's petition for review because, in our judgment, on the undisputed facts, distribution of the leaflet falls outside the boundaries of § 7's "mutual aid or protection" clause.

## I.

The day before Election Day, 1978, representatives of Local 174 requested permission from the industrial relations manager of Firestone's Riverview, Michigan, plant for employee distribution of a leaflet in nonworking areas of the plant during nonworking time. The two-page leaflet, titled "Protect your hard-won collective bargaining gains—VOTE on Tuesday, November 7," features the Union-endorsed candidates for Governor, United States Senator, and Justices of the Michigan Supreme Court; it describes the endorsed candidates as "committed to working for the best interests of working men and women" or "familiar with workers' needs."[1] Firestone's manager refused the requested permission and threatened disciplinary action if any employees distributed the leaflet at the plant.

The Union abandoned its plans for leafletting on plant premises, but filed an unfair labor practice charge against the Company. The charge asserted that distribution of the leaflet was protected activity under § 7 of the National Labor Relations Act, 29 U.S.C. § 157 (1976),[2] hence the Company's refusal to allow the distribution violated § 8(a)(1) of the Act, 29 U.S.C. § 158(a)(1) (1976).[3] The Board's General Counsel agreed with the Union and filed a § 8(a)(1) complaint against the Company. Since the Company's answer admitted all

---

[*] Sitting by designation pursuant to 28 U.S.C. § 294(d).

1. The leaflet is reproduced in full as an appendix to this opinion.

2. Section 7 provides that "[e]mployees shall have the right ... to engage in ... concerted activities for the purpose of collective bargaining or other mutual aid or protection." The full text of § 7 is set out in note 4, infra.

3. Section 8(a)(1) makes it an unfair labor practice "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in" § 7 of the Act.

material facts, the Board, on motion of the General Counsel, transferred the proceeding to itself and directed the Company to show cause why summary judgment should not be granted against it.

In response, the Company proposed that the parties first address the propriety of disposition without an evidentiary hearing; if the Board still determined to dispose of the case summarily, the parties could then file briefs on the merits. (J.A. (Joint Appendix) 29–30.) By telegram, the Board agreed to this proposal. (J.A. 31.) The parties thereupon filed briefs addressing the threshold procedural question, but the Board, with no further communication to the parties, issued a Decision and Order on the merits denying the General Counsel's motion for summary judgment, and granting summary judgment to the Company. The three-member panel declared it "clear as a matter of law" that distribution of the leaflet did not constitute concerted activity for the "mutual aid or protection" of employees; therefore the Company's refusal to permit the distribution did not interfere with the employees' exercise of rights safeguarded by § 7.

Understandably upset that the Board had violated its agreement to limit initial argument and decision to the procedural issue and, thereafter, to establish a schedule for submissions on the merits, the Union moved for en banc reconsideration with oral argument and accompanied the motion with a memorandum of law. (J.A. 46–47.) Recognizing the merits of the Union's procedural point, the same three-member panel granted the Union's request to the limited extent of reconsidering the merits "in light of the Charging Party's Motion and supporting memorandum and Respondent's Opposition thereto" (J.A. 49); upon such reconsideration, the panel reaffirmed its original Decision and Order. The Union petitioned this court for review.

## II.

■ The Board's manner of proceeding in this case was indefensible. After specifically instructing the parties to limit argument to the propriety of disposition by summary judgment, the panel skipped beyond that question and, without benefit of briefs, issued a decision on the merits. In addition to the obvious unfairness to the participants, the rush to judgment that occurred here diminishes respect for the Board; it fosters the impression that administrative agencies do not heed what those subject to their regulation say. The Board's handling of the matter, in short, was at odds with traditions of due process and orderly administrative procedure.

Nevertheless, a remand would serve no useful purpose, nor does the Union invite us to return the case to the Board. All parties now agree that the facts are undisputed, the leaflet "speaks for itself," and a pure question of law is at stake. Briefs and memoranda presented to the Board on the motion for reconsideration aired the parties' views on the merits of the unfair labor practice charge. Of more immediate prominence, the parties' positions have been briefed and argued comprehensively in this court. Consistent with the request for a final decision in all of the presentations before us, we turn to resolution of the substance of the controversy.

## III.

■ Our inquiry is guided by *Eastex, Inc. v. NLRB*, 437 U.S. 556, 98 S.Ct. 2505, 57 L.Ed.2d 428 (1978), in which the Supreme Court upheld an NLRB determination that an employer committed an unfair labor practice when it banned employee distribution of a newsletter criticizing a proposal to incorporate a "right-to-work" provision into the state constitution and a recent Presidential veto of a federal minimum wage increase. The Court ruled that characterization of "right-to-work" laws and minimum wage levels as political issues did not remove distribution of the newsletter from shelter under the "mutual aid or protection" clause of § 7. *Id.* at 570 n.20, 98 S.Ct. at 2514 n.20.[4] That clause, the Court said,

---

4. Section 7, as amended, as set forth in 29 U.S.C. § 157, states in full:

Employees shall have the right to self-organization, to form, join, or assist labor or-

encompasses employee endeavors to improve terms and conditions of employment, or the well-being of workers outside the immediate employee-employer relationship. *Id.* at 565–67, 98 S.Ct. at 2512–2513.

But the range of § 7's "mutual aid or protection" clause, the Court assumed in *Eastex,* is not infinite. "[A]t some point," the Court noted, the relationship of a proposed activity to employees' interests as employees "becomes so attenuated that [the] activity cannot fairly be deemed to come within the . . . clause." *Id.* at 567–68, 98 S.Ct. at 2513. The Court, however, did not consider itself the proper forum of first instance "to delineate precisely the boundaries" of the statutory "mutual aid or protection" language. "That task," the Court said, "is for the Board to perform . . . as it considers the wide variety of cases that come before it." *Id.* at 568, 98 S.Ct. at 2513. Stressing that it anticipated "case-by-case" Board consideration, *id.* at 570 n.20, 98 S.Ct. at 2514 n.20, the Court footnoted with apparent approval an NLRB decision distinguishing the Board's *Eastex* ruling. *Id.* at 568 n.18, 98 S.Ct. at 2513 n.18. That decision, *Ford Motor Co.,* 221 N.L.R.B. 663 (1975), enf'd, 546 F.2d 418 (3d Cir. 1976), involved an employer's refusal to permit election eve distribution of a tract urging workers to reject both Democratic and Republican politicians and to support formation of an "independent workers party." The Board held the distribution unprotected by § 7 even though "the election of any political candidate may have an ulti-

mate effect on employment conditions." 221 N.L.R.B. at 666.

The question we must resolve, then, is whether the handout before us bears, as the *Eastex* newsletter did, a sufficiently close relationship to employees' interests as to come within the guarantee of § 7's "mutual aid or protection" clause, or whether the link is so attenuated that § 7 does not shelter the activity.[5] The *Eastex* newsletter singled out and discussed two topics of immediate economic concern to employees, "right-to-work" laws and minimum wage levels. At the conclusion of the discussion, union members were urged to "elect our friends," and were reminded to register to vote. No election was pending. No particular candidates were named. The focus of the material was issues, not candidates.

The leaflet here, in contrast, focuses on the election of four candidates identified by name (printed twice in large bold-face type) and photograph. Preceding the candidate identification, the handout lists an assortment of issues of general concern to workers, but discussion of the listed issues is sparse. The dominant message conveyed by the leaflet is to vote for the endorsed individuals. We cannot disagree with the Board's conclusion that the principal thrust of the leaflet was to induce employees to vote for specific candidates, not to educate them on political issues relevant to their employment conditions.

The Union argues that the Board is taking a "we know it when we see it" ap-

---

ganizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a)(3) of this title [29].

The Court, much earlier, had held that an employer may not prohibit its employees from distributing union organizational literature in

nonworking areas during nonworking time absent a showing that the ban is necessary to maintain plant discipline or production. *Republic Aviation Corp. v. NLRB,* 324 U.S. 793, 65 S.Ct. 982, 89 L.Ed. 1372 (1945).

5. *Eastex* involved two distinct questions: (1) whether, apart from the location of the activity, distribution of the newsletter was the kind of concerted activity encompassed by § 7; (2) if § 7 sheltered the activity, did the employer have a countervailing interest in precluding use of its premises for the activity. 437 U.S. at 563, 98 S.Ct. at 2511. In this case, only the first of the two questions is before us.

proach[6] that leaves both employees and employers without standards to guide their future conduct. This position, we believe, ignores the Supreme Court's direction in *Eastex* that the Board proceed "case-by-case." Moreover, the Board has indicated the approach it is taking.

In its brief to this court the Board states that it is attempting to range union "political" communication along a continuum, placing at one end literature dominantly aimed at inducing votes for specific candidates, and at the other, literature designed principally to educate employees on political issues that may impinge on their employment conditions.[7] We find this approach to be consistent with the Supreme Court's statements in *Eastex* that § 7 protection may depend upon the object or context of the activity. 437 U.S. at 568 & n.18, 570 n.20, 98 S.Ct. at 2513 & n.18, 2514 n.20.

The Board acknowledges that it may some day confront literature ranged around the midpoint of the spectrum, cases presenting close questions as to protected status. This, however, is not such a case. The leaflet before us does "speak for itself." We conclude, as did the Board, that it falls securely at the unprotected end of the spectrum. Accordingly, the Union's petition for review is denied.

*It is so ordered.*

APPENDIX

# Protect your hard-won collective bargaining gains—

# VOTE on Tuesday, November 7

---

**6.** *Cf. Jacobellis v. Ohio*, 378 U.S. 184, 197, 84 S.Ct. 1676, 1683, 12 L.Ed.2d 793 (Stewart, J., concurring).

**7.** Brief for the National Labor Relations Board at 9–10.

# Don't let your gains at the bargaining table be wiped out in Lansing and Washington.

Collective bargaining agreements are not unbreakable rocks of economic security—they're vulnerable to the changing tides of state and federal government.

**For example, take state government. The degree of safe working conditions in shops and plants is dependent on how many safety inspectors are hired by the state Department of Labor, and how vigorously they do their job. The administration of workers' and unemployment compensation benefits is also the responsibility of the Department of Labor.**

Even our fringe benefits are affected by what state government does. The level of Blue Cross-Blue Shield premiums, which is regulated by the state insurance commission, affects the cost of our negotiated health care benefits. Similarly, the level of state unemployment compensation benefits determines how much SUB money must be paid out to laidoff auto workers. Therefore, the less money paid out for such things as SUB and health care, the more money that can be freed for other negotiated benefits.

The story is much the same concerning the federal government—its action or inaction affects our collective bargaining agreements.

Action by the federal government to reduce inflation and taxes would give workers additional purchasing power. A system of national health care could free up for other purposes the money now diverted in our contracts for health care benefits.

**Better funding for the Occupational Safety and Health Administration could ensure safer working conditions. A labor law reform bill would end the stalling tactics used by employers to prevent collective bargaining with unions. And plant closing legislation would prevent workers from being left with nothing but a worthless contract when a plant closes or moves away.**

So as you can see, what happens in state and federal government does affect what we accomplish at the bargaining table.

**To protect our collective bargaining gains, we need to send candidates to Lansing and Washington who will protect and strengthen those gains. That's why Michigan UAW-CAP is backing BILL FITZGERALD for governor and CARL LEVIN for U. S. senator—they're two men committed to working for the best interests of working men and women.**

William B.
**FITZGERALD**
for Governor

Carl
**LEVIN**
for U. S. Senator

# Don't forget the Supreme Court

Remember to vote for the Michigan Supreme Court on the blue non-partisan ballot—it's important to you and other workers.

**The Supreme Court rules on many issues vital to workers, such as workers' compensation benefits, insurance, unemployment compensation and others. Thus it's important to elect justices to the court who are familiar with workers' needs.**

Two such men are Justice G. Mennen Williams and Judge Gary McDonald, both of whom were nominated by the Democratic Party for the Supreme Court.

We need to elect justices to our state's highest court who understand the problems and needs of working people. That's why Michigan UAW-CAP endorses **G. MENNEN WILLIAMS** and **GARY McDONALD** for election to the Michigan Supreme Court on November 7.

 

G. Mennen        Gary

## WILLIAMS & McDONALD
### for
### Michigan Supreme Court

*Vote for ALL the CAP-endorsed candidates on Tuesday, November 7*

Paid for by Michigan UAW-CAP
8000 E. Jefferson, Detroit, MI 48214