**SQUIER DISTRIBUTING COMPANY, Petitioner, Cross-Respondent,**

v.

**LOCAL 7, INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA and National Labor Relations Board, Respondent, Cross-Petitioner.**

**Nos. 85–5943, 85–6119.**

United States Court of Appeals, Sixth Circuit.

Argued July 29, 1986.

Decided Sept. 15, 1986.

William P. Marks, Dresser, Marks, Svendsen, Oster, & Bird, Sturgis, Mich., Craig W. Lange, Riley & Roumell, Detroit, Mich., George Roumell, Jr. (argued), for petitioner, cross-respondent.

Elliott Moore, Robert Bell (argued), Deputy Associate Gen. Counsel, N.L.R.B., Washington, D.C., Linda Dreeben, Sandra Elligers, Bernard Gottfried, Director N.L.R.B., Detroit, Mich., for respondent, cross-petitioner.

Before KEITH and MARTIN, Circuit Judges, and RUBIN,* Chief District Judge.

BOYCE F. MARTIN, Jr., Circuit Judge.

This case is before the Court on the Squier Distributing Company's petition to review and the National Labor Relations Board's cross-application to enforce an order of the Board issued against the company on September 30, 1985. 276 N.L.R.B. No. 133. For the reasons that follow, we conclude that the Board's order should be enforced.

Squier Distributing Company is a wholesale distributor of alcoholic beverages based in Sturgis, Michigan. From December, 1980, through April, 1982, the company had ten employees, including a bookkeeper/clerk, a managerial assistant, and eight drivers/salesmen. Larry El Henicky became the company's general manager on December 1, 1980, as part of an agreement whereby all of the company's stock was to be transferred to him after he completed the one-year residence requirement to be eligible under Michigan law to operate an alcoholic beverage distributorship. Michigan reissues alcoholic beverage distribution licenses once a year on May 1. In order to avoid the seventeen-month delay before the license reissue could be effected and because his brother, Robert El Henicky, was a Michigan resident, Larry El Henicky transferred the stock into his brother's name. As part of this arrangement, Robert became company president on June 1, 1981, with responsibility for managing the office and maintaining good relations with its customers. Larry assumed the position of vice-president in charge of overall operations.

Seven months later, the arrangement ended abruptly because of a disagreement between the two brothers concerning Robert's supposed promise to invest in the company. Robert was relieved of his duties on December 31, 1981, but retained his title as president with the power to approve or veto major capital investments until May 1, 1982, when the license could be issued to Larry. At a meeting in January, 1982, Larry explained to the employees that Robert was no longer involved in the day-to-day operations of the company. He also emphasized at that meeting and others that the company was in poor shape financially, and expenses should be kept to a minimum.

Squier's bookkeeper, Sharon Roberts, began working for the company in 1977. In early January 1982 Larry told her to stop making journal entries for amounts due to the company from sales of crushed glass to the Owens-Illinois Glass Company. Instead, contrary to past procedure, Larry told her to give him cash for the checks, which he put into his pocket. On one occasion, when Roberts asked Larry why he

* The Honorable Carl B. Rubin, Chief United States District Judge for the Southern District of Ohio, sitting by designation.

was doing this, Larry remarked that it was the "boss' skim."

On January 27, Sharon Roberts called Robert El Henicky to express her concern about this change in procedure. Robert suggested that she set up a meeting of all the employees of Squier in her home. At this meeting, held on February 21, Sharon Roberts told the employees about Larry's actions. On that occasion Robert El Henicky expressed his fear that, as president of the company, he might be held responsible for Larry's actions. The other employees discussed their fear for their jobs if the company failed financially or if Larry lost the Michigan liquor license. The employees also discussed how best to protect their jobs, and considered petitioning to join a union.

As a result of this meeting and because of the brewing dispute between the brothers, Sharon Roberts gave an affidavit to the local sheriff on March 11 telling him the names of the other employees who had been required to cash checks for Larry El Henicky. By that time, the cashed checks amounted to almost $10,000. Robert El Henicky also gave an affidavit stating that to his knowledge, funds were being diverted from the company. After a second employees' meeting held on March 14, three other employees whom Larry had requested to cash checks gave statements to the sheriff regarding their experiences. The employees again expressed concern about the fate of the company, and of their jobs.

Without further investigation, on April 5, Larry El Henicky was arrested by the sheriff's deputies at the company's office on charges of embezzlement. He was released later that day and was directed to appear for a pretrial hearing on April 13. Following this appearance all charges against Larry El Henicky were dropped. Without further ado, three of the four employees who gave statements to the sheriff, Michael Fisher, Bernard Kuhl, and Lonnie Rowe, were discharged by Larry on Friday, April 16. Sharon Roberts was discharged when she returned to the office after a two-week vacation on Monday, April 19.

No reasons were given to any of the employees as to why they were discharged.

The National Labor Relations Board, affirming the administrative law judge, concluded on these facts that the company had violated section 8(a)(1) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1), by discharging these employees for participating in concerted activity for the purpose of mutual aid and protection. The Board issued a cease and desist order, and required the company to offer the four employes reinstatement and backpay.

Section 8(a)(1) of the Act provides that an employer is guilty of an unfair labor practice if he "interferes with, restrains, or coerces employees in the exercise of the rights guaranteed in Section 7." Section 7 guarantees to employees the right to engage in "concerted activities for the purpose of collective bargaining or other mutual aid or protection." The protection provided by section 7 includes "protect[ion] ... from retaliation by their employers when they seek to improve working conditions through resort to administrative and judicial forums." *Eastex, Inc. v. NLRB*, 437 U.S. 556, 566, 98 S.Ct. 2505, 2512, 57 L.Ed.2d 428 (1978).

The *Eastex* Court went on to state:

It is true, of course, that some concerted activity bears a less immediate relationship to employees' interest as employees than other such activity. We may assume at some point the relationship becomes so attenuated that an activity cannot fairly be deemed to come within the "mutual aid or protection" clause.

*Id.* at 567, 98 S.Ct. at 2513.

The question here, therefore, is whether the employees' actions in this case were sufficiently related to their "interest as employees" to come within the mutual aid or protection clause of section 7. The Board's decision that the employees' actions were protected is entitled to great weight so long as its factual findings are supported by substantial evidence found in the record as a whole and the Board's legal conclusions do not represent "an unreasonable or unprincipled construction of the

statute." *Ford Motor Co. v. NLRB,* 441 U.S. 488, 497, 99 S.Ct. 1842, 1849, 60 L.Ed.2d 420 (1978). *Accord Bonanno Linen Service, Inc. v. NLRB,* 454 U.S. 404, 413, 102 S.Ct. 720, 725, 70 L.Ed.2d 656 (1982). Where there is substantial evidence in the record to support the Board's factual determinations, we "may not 'displace the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo.*'" *NLRB v. Walton Mfg. Co.,* 369 U.S. 404, 405, 82 S.Ct. 853, 854, 7 L.Ed.2d 829 (1962), *quoting Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951).

An example of one recognized area of protected activity under section 7 is employee complaints to government agencies. In *Ambulance Services of New Bedford,* 229 N.L.R.B. 106, 109, *enf'd,* 564 F.2d 88 (1st Cir.1977), an employee who filed a criminal complaint against his employer for issuing dishonored paychecks was held to be engaged in protected activity. Similarly, employee complaints to the U.S. Coast Guard about the unsafe operation of a ship were held protected in *Socony Oil Co. v. NLRB,* 357 F.2d 662, 663 (2d Cir.1966). *See also Walls Mfg. Co. v. NLRB,* 321 F.2d 753, 754 (D.C.Cir.), *cert. denied,* 375 U.S. 923, 84 S.Ct. 265, 11 L.Ed.2d 166 (1963) (employee letter to state health department complaining about unsanitary restroom held protected).

The company cites to us several Board cases to support its contention that the employees' actions in this case were not sufficiently related to their jobs to fall within the "mutual aid or protection" clause. In *Damon House, Inc.,* 270 N.L.R.B. 143, 145 (1984), drug and alcohol abuse counselors were discharged for attacking their employer's ethics and his policies' impact on patient care. The letter, sent by the employees to the board of directors, parents of patients, and various state and local officials, was primarily concerned with the effects on the patients; only one paragraph of the letter even mentioned job-related concerns. The employ-

ees in this case, in contrast, were concerned with retaining their jobs during what they believed to be a financial crisis in the company.

The employees' actions in *Autumn Manor, Inc.,* 268 N.L.R.B. 239, 242–43 (1983), were also held to be unprotected because they were concerned only with the condition of the patients in their facility. While the situation in *Good Samaritan Hospital & Health Center,* 265 N.L.R.B. 618 (1982), was closer to the facts in this case, the employees in *Good Samaritan* accused their employer of mismanagement of public funds. In both these cases the concern exhibited by the employees was not for the retention of their jobs but for other laudable, but unprotected, goals.

The administrative law judge in this case credited the employees' testimony that they gave their statements to the sheriff out of fear of losing their jobs. The employees' overriding concern was clearly for their job security, and not for the efficacy of managerial decisions made by Larry El Henicky. At the same meetings which resulted in the statements given to the sheriff, the employees considered joining a union in order to protect their jobs. We believe that this documented motivation brings the employees' actions in this case within the ambit of the "mutual aid or protection" clause. *Compare NLRB v. Sheraton Puerto Rico Corp.,* 651 F.2d 49 (1st Cir.1981) (employees' attempt to have supervisor removed primarily managerial decision not protected by the Act).

We conclude that the Board's decision that the employees acted in good faith and out of concern for their job security is supported by substantial evidence. The company contends that we must also examine the means of protest employed in order to determine if the action taken in this particular case is protected under the Act. The only case addressing this contention in our Circuit, *Hagopian & Sons, Inc. v. NLRB,* 395 F.2d 947, 951–53 (6th Cir.1968), stated in dicta that concerted activity was not protected by the Act if it was "unlaw-

ful," "violent," "insubordinate," or "indefensible." The Board did not mention the means of the protest in its opinion, apparently following the theory that if the employees have a right to engage in the activity, the means can take almost any form. *See Abilities & Goodwill, Inc. v. NLRB,* 612 F.2d 6, 9 (6th Cir.1979).

 We decline to adopt the *per se* rule impliedly supported by the Board. The question whether employees' protests should be protected by the Act involves the balancing of sensitive competing interests, and the employees' method of protest is relevant as one factor affecting this balance. *See NLRB v. Local 1229, International Brotherhood of Electrical Workers (Jefferson Standard Broadcasting),* 346 U.S. 464, 74 S.Ct. 172, 98 L.Ed. 195 (1953). In this case, however, the employees' decision to give statements to the sheriff was a reasonable means by which to protect their job security. The employees did not make the decision to arrest their supervisor, nor did they libel him. Instead, they merely registered the facts with the appropriate governmental body. Under these circumstances, the employees' chosen means of protest appears to us reasonable.

The evidence is essentially uncontradicted that the four employees were discharged as a direct result of their statements to the sheriff regarding Larry El Henicky's alleged embezzlement of company funds. Only the employees who gave statements were fired. At the hearing before the administrative law judge, Larry admitted that he had fired the employees for failing to come forward and explain their actions. We agree with the Board that this is tantamount to firing the employees for their participation in protected activity. *NLRB v. Washington Aluminum Co.,* 370 U.S. 9, 14–17, 82 S.Ct. 1099, 1102–04, 8 L.Ed.2d 298 (1962). Furthermore, because of this admission this case is not a "mixed motive" case requiring analysis under *Wright Line, Inc.,* 251 N.L.R.B. 1083 (1980), *enf'd on other grounds,* 662 F.2d 899 (1st Cir.1981), *cert. denied,*

455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982).

We therefore conclude that the four employees in this case were discharged for engaging in activity protected under the Act, and affirm the Board's finding of an unfair labor practice.

The order of the Board shall be enforced.