# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued September 20, 2012      Decided December 14, 2012

No. 11-1282

MEDCO HEALTH SOLUTIONS OF LAS VEGAS, INC.,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

UNITED STEEL, PAPER AND FORESTRY, RUBBER,
MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE
WORKERS INTERNATIONAL UNION, AFL-CIO, CLC, LOCAL
675,
INTERVENOR

———

Consolidated with 11-1321

———

On Petition for Review and Cross-Application for
Enforcement
of an Order of the National Labor Relations Board

———

*Marc L. Zaken* argued the cause and filed the briefs for
petitioner.

*Amy H. Ginn*, Attorney, National Labor Relations Board, argued the cause for respondent. With her on the brief were *John H. Ferguson*, Associate General Counsel, *David Habenstreit*, Assistant General Counsel, and *Jill A. Griffin*, Supervisory Attorney. *Daniel A. Blitz*, Attorney, entered an appearance.

*Amanda M. Fisher* argued the cause and filed the brief for intervenor. *Daniel M. Kovalik* entered an appearance.

Before: ROGERS and KAVANAUGH, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* WILLIAMS.

WILLIAMS, *Senior Circuit Judge*: This case arises mainly from an employer's belief that exclaiming "WOW" to celebrate workers' special achievements would hearten the workers and quicken their zeal. As so often in human relationships, things proved more complicated.

Petitioner Medco Health Solutions of Las Vegas, Inc. is a pharmacy benefits management company that sells pharmaceuticals out of a mail-order facility in Las Vegas, Nevada. It receives and fills prescriptions through an automated process and mails completed orders to patients. The company employs nearly 850 people at its Las Vegas facility, including pharmacists, coverage review representatives, and pharmacy technicians. These workers are represented by the United Steel Workers Local No. 675. The pharmacists belong to the "pharmacists unit," the others to the confusingly labeled "pharmacy unit."

In the summer of 2009, in an effort to encourage superior performance, Medco introduced what it called the "WOW program." (WOW is apparently just an exclamation, not an acronym.) The program centers on weekly events at which designated employees receive "WOW awards" in recognition of their achievements. The awards do not entitle the recipient to monetary compensation, and they carry no weight in determining promotions or wage increases (though presumably the conduct underlying the awards may do so). Employees may decline WOW awards and are not required to attend the weekly recognition ceremonies.

Medco thought the program was a nice gesture, one that employees would appreciate. It clearly believed that customers and potential customers—e.g., firms that use Medco to meet the pharmacy needs of insured workers—would view the program as manifesting Medco's commitment to service. When Medco's managers showed the representatives of such firms around the facility, a regular stop was an installation in the cafeteria called the "Wall of WOW," displaying recent WOW awardees, along with the reasons they received their awards. Approximately one hundred such customer tours take place each year, about two a week. Medco also featured the WOW program in a slide presentation that it routinely showed to tour groups.

Not all employees shared Medco's sunny outlook on the program. On February 12, 2010, employee Michael Shore (vice-chairman of the "pharmacy unit") wore a T-shirt to work, its front bearing the union logo and its back the message, "I don't need a WOW to do my job."

The same day, representatives of the Land O'Lakes company, a Medco client, were scheduled to tour the facility. Word that Shore had been wearing the T-shirt in the cafeteria during his lunch break reached Vice President and General

Manager Tom Shanahan, who summoned Shore to his office. Shanahan expressed surprise and disappointment at Shore's decision to wear the shirt, which he felt was "insulting" to Medco, and asked Shore to remove it. Shanahan added that if Shore did not feel he could support the WOW program, "there were plenty of jobs out there." Shore complied with Shanahan's request and did not wear the T-shirt again. In the ensuing proceedings before the National Labor Relations Board, Medco invoked in support of its conduct a provision of its dress code then in effect banning "Phrases, Words, Statements, pictures, cartoons or drawings that are degrading, confrontational, slanderous, insulting or provocative." Medco appears never to have objected to clothing bearing a union logo or name.

Out of these events sprang charges of violations of § 8(a)(1) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1), charges that the Board upheld in almost every aspect. *Medco Health Solutions of Las Vegas, Inc.*, 357 NLRB No. 25, at 1 (2011).

At the same time another dispute arose, unrelated except that it involved a dress code provision, Medco, and the same general time period. This clash started November 19, 2009, when Medco notified the chairman of the pharmacists unit of a change in dress code policy to be announced the following day. The Board's General Counsel charged Medco with violating §§ 8(a)(1) & (5) of the Act, 29 U.S.C. §§ 158(a)(1) & (5), by refusing to bargain over the change, and the Board upheld the charge. *Medco*, 357 NLRB No. 25, at 2.

Medco now timely petitions for review of the Board's order as to both matters, and the Board cross-applies for enforcement. As to the amendment of the dress code, we uphold the Board. Various aspects of the T-shirt dispute, however, require us to remand the matter to the Board for

further proceedings. The dress code amendment issue being fairly simple, we will clear it out of the way first, then tackle the T-shirt question.

* * *

*Pharmacists' dress code changes.* On November 19, 2009, Medco alerted William Webb, chairman of the pharmacists unit, to a change in dress code policy to be announced the following day. Effective January 1, 2010, the company would require pharmacists to wear lab coats during working hours and dress in business casual on scheduled tour days. Management also told Webb that if the union had any questions or concerns it should let Medco know by the following day.

On December 9, Webb emailed Medco a request to bargain over the issue. Medco responded that it "would be happy to . . . discuss the upcoming change," but said it did "not believe this is a mandatory subject for bargaining." Joint Appendix ("J.A.") 497. The next day, Medco and the union met to discuss the changes to the dress code. Medco began the meeting by reiterating its view that the dress code was not subject to mandatory bargaining. Union representatives left the meeting after concluding that Medco was immovable. The new dress code went into effect as scheduled.

Medco does not now appear to contest that dress codes qualify as a mandatory subject of bargaining contemplated by the Act. See *Yellow Enterprise Systems*, 342 NLRB 804, 827 (2004). Rather, it argues that the United Steel Workers had agreed that a management rights clause in an expired contract between Medco and a predecessor union would remain in effect while the United Steel Workers negotiated a new collective bargaining agreement with Medco. This clause, it contends, entitled Medco to promulgate the dress code

changes when the union failed to raise questions or concerns within 24 hours of Medco sharing the policy with the union chair of the pharmacists unit. But the ALJ explicitly refused to credit the testimony offered by Medco in support of the alleged agreement to let the old contract continue in effect, and the Board accepted that ruling. 357 NLRB No. 25, at 2-3. Medco offers nothing to suggest that this case is among the rare instances where we can properly overturn such a credibility finding. See, e.g., *Federated Logistics & Operations v. NLRB*, 400 F.3d 920, 923 (D.C. Cir. 2005).

Medco argues in the alternative that it *did* bargain with the Union, and that the Board erred by focusing solely on Medco's statement that it would not bargain. Medco urges us to look at the totality of its conduct, which it asserts demonstrated a good-faith effort to bargain that ended in impasse. But in fact that pattern consisted of repeatedly denying any intent to bargain, and then declining to entertain any concessions. Sustaining Medco's objection would require us and the Board to accept the idea that such a strategy amounts to "bargaining" under the Act, a notion that would vitiate § 8(a)(5)'s language making it an unfair labor practice to "refuse to bargain."

*The anti-WOW T-shirt.* After a hearing on the General Counsel's complaint, an ALJ found against Medco with respect to the T-shirt charge. Specifically, he found: (1) that Shore's wearing of the T-shirt was a "union supported protest of a working condition" protected by § 7 of the Act; (2) that Medco, through Shanahan's observation that if Shore did not feel he could support the WOW program there were plenty of jobs out there, had unlawfully invited Shore to quit his employment in response to his protest of working conditions; and (3) that Medco's application to Shore of the dress code's ban on "insulting" language had restricted the employees' § 7 rights in violation of § 8(a)(1). 357 NLRB No. 25, at 7-8 &

n.3. Finally, reading the dress code's prohibitions on "provocative" and "confrontational" statements as being reasonably understandable as restraining protected activity, the ALJ found that Medco had violated § 8(a)(1) by "maintaining overly broad work rules," seemingly a kind of facial invalidation. *Id*. at 8.

In affirming, the Board departed from the ALJ's analysis only in declining to reach the merits of his finding that employees would reasonably read the dress code to restrict § 7 activity, explaining that such a violation would not change the remedy awarded the union. *Id*. at 2. Yet, among the other remedies, the Board ordered Medco to cease enforcement of and to rescind the ban on "provocative, insulting, or confrontational" statements. *Id*. at 3-4.

Section 7 of the Act grants employees the right "to engage in . . . concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157. Section 8(a)(1) enforces § 7 by making it unlawful for employers to "interfere with, restrain, or coerce" employees' exercise of their rights under that provision. *Id*. § 158(a)(1).

Medco contends that Shore's behavior was not protected by § 7, and that therefore no § 8(a)(1) violation occurred. Its challenge rests on three arguments. First, it claims that Shore's activity was not concerted because he was not acting on behalf of his colleagues or in furtherance of a group purpose. Second, Medco asserts that, even if Shore's behavior was concerted, it was not for the purpose of "collective aid or protection" in that it did not seek to improve a term or condition of employment. Finally, Medco maintains that even if Shore's behavior was concerted and relating to a condition of employment, it was not protected by § 7 because of "special circumstances"—principally that the message on

Shore's shirt disparaged Medco and threatened to harm Medco's relationship with its customers.

In fact the record adequately supports the Board's conclusion that Shore was engaging in concerted activity in wearing the T-shirt. The shirt's presence in Las Vegas stemmed from a January 2010 trip by pharmacy unit chairperson Marissa Osterman to Tampa for a meeting of union leaders from across Medco offices. There she received the T-shirt from the president of a Medco sister unit in Pittsburgh. The shirt had been designed for a union unity protest against the WOW program. She brought it back to Las Vegas and gave it to Shore.

Shore testified that he had worn the T-shirt "because of the [union] logo, first of all," but when asked for his opinion of the WOW program, he replied: "[M]y T-shirt said it all. I don't need a WOW to do my job." J.A. at 240. Although he testified that he did not discuss the T-shirt with anyone before wearing it to work, he also said that in his capacity as union vice-chairman he had received complaints about the WOW program. He added that on the day he wore his shirt he received words and gestures of approval from his colleagues.

We have upheld the Board's definition of "concerted activity" as encompassing "those circumstances where individual employees seek to initiate or to induce or to prepare for group action, as well as individual employees bringing truly group complaints to the attention of management." *Prill v. NLRB*, 835 F.2d 1481, 1484 (D.C. Cir. 1987). In evaluating whether an employee acted concertedly, "[t]he touchstone for concerted activity . . . must be some relationship between the individual employee's actions and fellow employees." *Int'l Transp. Service, Inc. v. NLRB*, 449 F.3d 160, 166 (D.C. Cir 2006). The account above amply shows that Shore "brought a group complaint to management's attention." His and

Osterman's testimony leaves little doubt that some Medco employees in both Las Vegas and Pittsburgh disliked the WOW program and that the T-shirt reflected that discontent.

Medco offers two specific points against this conclusion. First it notes Shore's failure to discuss his T-shirt plans with his colleagues. But we have never said that the Board can find concerted action only where an employee obtained the consent or acknowledgment of his or her coworkers before bringing a group complaint to the attention of management. In fact, we have recognized the opposite contention. "[A]n individual who brings a group complaint to the attention of management is engaged in concerted activity even though he was not designated or authorized to be a spokesman by the group." *Citizens Inv. Services Corp. v. NLRB*, 430 F.3d 1195, 1198-99 (D.C. Cir. 2005) (citations omitted).

Second, Medco asserts that Shore said he didn't wear the T-shirt as a protest of the WOW program. But the passage of the transcript that Medco cites in support of its claim contains no such remark. See Petitioner's Brief at 7 (citing J.A. at 241, 254). We thus sustain the Board's finding of concerted activity.

Medco's second argument is likewise unavailing. Section 7 protects workers' concerted action "for the purpose of collective bargaining or other mutual aid or protection." Under this language the purposes of protected concerted activities extend beyond "the narrower purposes of 'self-organization' and 'collective bargaining.'" *Eastex, Inc. v. NLRB*, 437 U.S. 556, 565 (1978). Before the Board, Medco argued that the object of Shore's protest, the WOW program, is not a "term or condition of employment" (*Eastex*'s phrase for the subjects for which workers may engage in concerted activity, *id*.) because it is unrelated to "discipline," "wage increases," or "promotions" and does not involve "monetary

compensation." Respondent's Brief at 26, *Medco Health Solutions of Las Vegas, Inc.*, 357 NLRB No. 25 (2011) (Nos. 28-CA-22914, 22915). The Board rejected these arguments, reasoning that "a program intended to create an incentive for employees to work harder or be more productive" qualifies as a condition of employment. *Medco*, 357 NLRB No. 25, at 2 n.6. The Board's position is obviously sounder than Medco's, which would exclude from § 7's protection not only Medco's WOW program but a host of other issues that are not merely "terms and conditions of employment" within the meaning of *Eastex* but are mandatory subjects of collective bargaining, such as worker safety. See, e.g., *United Steelworkers, AFL-CIO-CLC v. Marshall*, 647 F.2d 1189, 1236 (D.C. Cir 1980).

Before the Board and on appeal Medco has invoked *New River Industries, Inc. v. NLRB*, 945 F.2d 1290 (4th Cir. 1991), in which the court held that employees' concerted satirical attacks, leveled at an employer's one-time provision of free ice-cream cones in celebration of the firm's execution of a favorable contract, were unprotected. The only links between the two cases are (1) ice cream (which was provided to Medco employees at the weekly WOW events), and (2) the satirical nature of the worker "protest." But in *New River* the company's ice cream distribution was a one-time event, and was related solely to management's enthusiasm for a third-party contract, not to its effort to create, in the words of the Board, "an incentive for employees to work harder or be more productive." *New River* is thus no obstacle to our affirming the Board's finding on this point.

Medco's final argument is that Shore's wearing the T-shirt potentially affected its relationship with its customers in a way that created "special circumstances" justifying its response. Here the ALJ and Board offered no clear answer. The Board's opinion adopted wholesale the ALJ's cursory reasoning that no "absolute ban" was justifiable because "the

tours were not a daily occurrence." 357 NLRB No. 25, at 2. The Board further found that, even if the tours were conducted daily, Medco's argument would still fail because the company had not offered any evidence that the T-Shirt posed a real risk of harm to the customer relationship. *Id.*

We note first that the fact that the tours were not an everyday occurrence does not mean that they were so predictable that Medco could have devised a rule that would have reliably screened customers from messages such as the one on Shore's T-shirt. Shanahan and another Medco manager both testified that unscheduled tours occurred periodically, and that visitors sometimes entered the Las Vegas facility without advance notice. See J.A. at 148, 317. The Board did not directly address this testimony, but rather observed in a footnote that "[t]he record also shows that employees generally received advanced notification of upcoming tours." 357 NLRB No. 25, at 2 n.7. Even under our highly deferential standard of review, requiring us to affirm the Board's application of law to facts except where "arbitrary or otherwise erroneous," *Guard Publishing Co. v. NLRB*, 571 F.3d 53, 58 (D.C. Cir. 2009), the Board cannot be said to have offered a "reasoned explanation" for rejecting Medco's argument in favor of a rule applying throughout the working day, see *Int'l Transp. Service*, 449 F.3d at 163.

Of course if Medco could not lawfully have banned the anti-WOW T-shirt even at times coincident with customer tours, the timing issue would not help it. But on the issue of a partial ban, the Board's reasoning was equally deficient. Medco makes a straightforward argument that the message on the T-shirt was insulting to the company and would have undermined its efforts to attract and retain customers. To that end, Medco has provided considerable evidence that the WOW program is an important element of the pitch it gives prospective and current clients; the company even assigns a

fulltime employee to manage the program. This evidence, and the tone of the T-shirt gibe at Medco's management, seem to preclude an offhand dismissal of the contention that the T-shirt would threaten to damage Medco's relationship with its customers. Yet the Board concluded that Medco had "not offered any evidence that the slogan reasonably raised the genuine possibility of harm to the customer relationship." 357 NLRB No. 25, at 2.

We find this conclusion puzzling, for the Board has had no difficulty in identifying potential harm to customer relations in prior rulings. In *Pathmark Stores, Inc*., 342 NLRB 378, 379 (2004), the Board held that a grocery store could, because of its "legitimate interest in protecting its customer relationship," lawfully prohibit its employees from displaying the message "Don't Cheat About the Meat!" in protest of the store's use of prepackaged meat products. And in *Noah's New York Bagels, Inc.*, 324 NLRB 266, 275 (1997), the Board upheld a ban on T-shirts reading "If its [sic] not Union, its [sic] not Kosher." In neither of these cases did the Board require the employer to offer additional evidence beyond a relationship between its business and the banned message. In *Pathmark* the Board explicitly acknowledged that the company had "presented no evidence that customers decided not to buy" its products in response to the banned slogan, but upheld the ban because it found "the slogan reasonably threatened to create concern among [the company's] customers." 342 NLRB at 379.

We do not think the Board has adequately explained why Medco's claim of harm to customer relations requires evidence beyond what it has already adduced, while those of the employers in *Pathmark* and *Noah's New York Bagels* required none. At oral argument Board counsel proposed to read these cases as limited to disparagements of an employer's merchandise. But obviously an employee can harm an

employer's customer relations by belittling or critiquing other aspects of the employer's operations. Especially for a firm selling a *service*, concern for customers' appraisal of its employees' attitudes seems natural. Obviously we don't mean to suggest that employers are free to suppress employee speech in the interest of presenting a Potemkin village of intra-firm harmony, but that is quite different from trying to exclude the display of slogans that an outsider might read as sullen resentment (especially when the object of discontent is something so seemingly inoffensive as the WOW program).

We recognize that "the Board draws on a fund of knowledge and expertise all its own," *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 612 n.32 (1969), but that expertise is surely not at its peak in the realm of employer-*customer* relations. And the Act of course protects a wide spectrum of lawful means of protesting employer policies and actions, some of which may occur in the presence of customers. But if the Board wishes to locate an employee's behavior within that spectrum, it must supply a more meaningful analysis than it has offered here.

In describing the ALJ's and the Board's analyses, we noted that while the ALJ had not only condemned Medco's application of the dress code's ban on "insulting" language to Shore but also found its prohibition of "provocative" or "confrontational" messages overly broad, the Board explicitly refrained from endorsing the ALJ's second finding. Yet the Board's order directs Medco to "[r]escind the overly broad work rules that prohibit employees from wearing clothing with messages that are provocative, insulting, or confrontational." 357 NLRB No. 25, at 3. In adopting this provision, the Board neither followed the reasoning of the ALJ nor substituted its own. It offered no explanation for its implicit ruling that each of the three adjectives was overly broad.

In the past we have found the Board "remarkably indifferent to the concerns and sensitivity" that lead employers to adopt rules intended "to maintain a civil and decent workplace." *Adtranz ABB Daimler-Benz Transp., N.A. v. NLRB*, 253 F.3d 19, 25, 27 (D.C. Cir. 2001). In *Lutheran Heritage Village-Livonia*, 343 NLRB 646, 647 (2003), the Board appeared to accept *Adtranz*'s holding on employers' rights to maintain such a workplace. Moreover, when a rule neither expressly nor inherently restricts protected activity, the Board appeared in *Lutheran Heritage* to condition any decision that the rule's mere existence violated the Act on a finding either that the rule was promulgated in response to union activity or that a reasonable employee reading the rule would construe it to prohibit protected conduct. *Id.* For no apparent reason the Board seems to have abandoned that analysis in proscribing Medco's ban on provocative and confrontational words. As a general matter, we suspect that such expressions are seldom found in civil and decent places of employment.

\* \* \*

For the reasons above, we deny Medco's petition to review the Board's determination that Medco committed an unfair labor practice by refusing to bargain on its amendment of the pharmacists' dress code. We grant the Board's cross-application for enforcement on this issue. But we set aside the Board's determination that Medco violated the Act in ordering Shore to remove his T-shirt, and in its ban on insulting, provocative and confrontational expressions on clothing. We remand for further proceedings consistent with this opinion.

*So ordered.*