STAHL, Circuit Judge,
Concurring in part and dissenting in part.
In this case, a newly certified union alleged that some of Boch’s 2010 workplace policies were too broad, such that employees might believe their labor rights were restrained. Boch began discussions with the union over possible revisions to the policies, but, within the year, employees filed a petition to decertify the union. Boch turned discussions to the Board’s regional office to ensure that its policies complied with federal law. Before discussions were complete, the Board issued a formal complaint based on the union’s charge. Nonetheless, Boch continued to work hand-in-hand with the Board’s regional office to address its concerns and soon issued a revised set of workplace policies. Despite these efforts — and the Board’s purported aim of working with employers to remedy violations — the Board maintained the breadth of its complaint and argued that Boch had failed to repudiate its 2010 policies.
With respect to the allegedly violative policies contained in Boch’s 2010 employee handbook, I concur in the result but write separately to make clear that my concurrence is limited to the narrow evidentiary record and legal arguments before us. With respect to the majority’s decision regarding Boch’s “dress ban” (or, what most of us might simply call a “dress code”), however, I dissent because I believe that Boch has demonstrated “special circumstances” warranting its policy.
I.
As the majority points out, Boch did not challenge the Board’s ruling that the 2010 policy provisions at issue were unlawful when imposed. Ante, at 565. Instead, Boch contends that it adequately “repudiated” the alleged violations by issuing the revised 2013 handbook. I agree with the majority that, based on the evidentiary record and legal arguments before us, Boch has failed to show that the Board erred in rejecting this argument.
In.order for an employer’s repudiation of prior conduct to be effective, the repudiation “must be ‘timely,’ ‘unambiguous,’ ‘specific in nature to the coercive conduct,’ and ‘free from other proscribed illegal conduct.’ ” Passavant Mem’l Area Hosp., 237 NLRB 138, 138 (1978). The Board also examines whether the employer has provided “assurances” to employees that there will not be future interferences with their rights. Id. at 138-39.
Boch cites cases wherein repudiation was held to be effective despite various Passavant factors only being implicitly and/or partially satisfied. See In River’s Bend Health & Rehabilitation Serv. (“River’s Bend”), 350 NLRB 184, 184, 193 (2007) (holding repudiation effective where employer posted memorandum implicitly conceding violation and implicitly providing assurances against future violations); Broyhill Co., 260 NLRB 1366, 1366-67 (1982) (holding repudiation effective where *578 employer posted notice sufficiently disavowing violation and including “we will not” language that is traditionally employed in Board notices). But, as the majority points out, these cases miss the mark. There is a difference between arguing that you have implicitly satisfied individual Passavant factors and arguing that the mere cessation of an ongoing violation constitutes an “implicit” repudiation. Such an interpretation would make the very concept of repudiation meaningless. Because Boeh did not even advise its employees that some of its 2010 policies “may have been” overly broad, ante, at 567, I agree that the Board did not err in finding a lack of adequate repudiation.[16]
I write separately to emphasize that my concurrence is limited to the narrow factual record and legal arguments in the parties’ petitions. From what we have before us, the record appears to have been improperly truncated. As Boch rightly points out, and the majority acknowledges, the ALJ seemed to remove the challenges to the 2010 policies from the table altogether during an initial hearing on the complaint. Ante, at 563. After evidence had been heard, the Board, in its briefing to the ALJ, resuscitated its challenges to the 2010 policies. Ante, at 563. Without giving Boch an opportunity to add to the record, the ALJ found that “[ajlthough I originally agreed with counsel for the Respondent that it would not effectuate the policies of the Act to spend time on these allegations which had already been remedied, a careful examination of the Board’s cases, convinces me that my initial impression was incorrect.” Boch Imports, Inc. (“Boch Imports”), 362 NLRB No. 83, 2015 WL 1956199, at *8 (Apr. 30, 2015).
Boeh argues, quite persuasively, that it was lulled by the ALJ into not presenting evidence of repudiation and that we should remand to the Board and permit Boch the opportunity to develop the record. Unfortunately, this argument was not made below and has been raised for the first time to us in Boch’s petition. As such, it is not properly before us and we must work with the factual record as its stands. Ante, at 567-68 n. 4.
Apart from Boch’s failure to preserve an opportunity to develop the record, it also failed to preserve a challenge to the underlying premise of liability. Section 7 of the Act, 29 U.S.C. § 157, guarantees employees “the right to self-organization, to form, *579 join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection.” Section 8(a)(1) of the Act, 29 U.S.C. § 158(a)(1), in turn, makes it an unfair labor practice for an employer “to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in [Section 7].”
In examining workplace rules, the Board first determines whether the rule explicitly restricts activity protected by Section 7. Martin Luther Mem’l Home, Inc. (“Martin Luther”), 343 NLRB 646, 646 (2004). If it does, the rule is unlawful. Id. If the rule does not, however, then there is only a violation if “(1) employees would reasonably construe the language to prohibit Section 7 activity; (2) the rule was promulgated in response to union activity; or (3) the rule has been applied to restrict the exercise of Section 7 rights.” Id. at 647. In evaluating the challenged rule, the Board must give the rule a reasonable reading, must refrain from reading particular phrases in isolation, and must not presume improper interference with employee rights. Id. at 646.
The ALJ in this case acknowledged that the rules at issue did not explicitly restrict Section 7 activity, were not promulgated in response to union activity, and had not been applied to restrict the exercise of Section 7 rights. Boch Imports, 2015 WL 1956199, at *8. As such, the ALJ rightly recognized that the policies would only violate Section 8(a)(1) if employees would reasonably construe them as prohibiting Section 7 activity. Id. The ALJ then purported to apply that law to the 2010 policies.
But here, the ALJ misstepped and inexplicably abandoned the proper legal standard in the process of attempting to apply it. For example, the ALJ found that particular aspects of Boeh’s confidential and proprietary information rule “could lead an employee to believe that his ability to discuss his terms and conditions of employment with fellow employees, the media or a union were limited.” Id. (emphasis added). Similarly, the ALJ found that “the provision prohibiting any activity which could harm the image or reputation of the company is clearly susceptible of being understood to limit employees in their right to engage in a strike, work stoppage or similar forms of concerted activities.” Id. (emphasis added).
This is not merely a matter of semantics. One can imagine a number of rules that would not reasonably be construed by employees as limitations on Section 7 rights even if they could be construed as limitations on Section 7 rights. The reasonably-construe standard is a narrow exception to the rule that neutral, reasonable workplace policies that do not explicitly restrict Section 7 rights generally do not violate Section 8(a)(1). Like the exceptions for purportedly “neutral” policies that are adopted in response to union activities or enforced in targeted ways, the purpose of the reasonably-construe exception is to catch those rare policies that, while facially neutral and legitimate, can be understood as little else but a restriction upon Section 7 rights.
By striking policies that merely could be construed to restrict Section 7 rights, the ALJ transformed the reasonably-construe standard from a narrow exception into a freestanding, and highly intrusive, test. Such a standard would capture a far wider sweep of plainly legitimate business policies in its maw and would radically expand the Board’s authority. In effect, such a standard would grant the Board wide-ranging license to draft and impose its own *580 preferred workplace policies under the threat of litigation.
The Board has previously disavowed this approach. In Martin Luther, for example, the Board declined to find a Section 8(a)(1) violation where the employer had adopted rules that “serve[d] legitimate business purposes” and that would not be construed by a reasonable employee to prohibit Section 7 conduct. See 343 NLRB at 647. The Board further held:
Where, as here, the rule does not refer to Section 7 activity, we will not conclude that a reasonable employee would read the rule to apply to such activity simply because the rule could be interpreted that way. To take a different analytical approach would require the Board to find a violation whenever the rule could conceivably be read to cover Section 7 activity, even though that reading is unreasonable. We decline to take that approach.
Id. Therefore, the burden never should have shifted to Boch to show repudiation because, in my view, the ALJ failed to properly apply the correct standard of liability in the first place.[17]
Yet, as with Boch’s failure to preserve its evidentiary objections, Boch failed to sufficiently raise this issue before us or below.[18] With these limitations in mind, I concur in the judgment with respect to Boch’s 2010 policies.
II.
The majority also upholds the Board’s decision that Boch violated Section 8(a)(1) with its dress code policy and that Boch failed to demonstrate “special circumstances” justifying the allegedly unlawful policy. Because I take a fundamentally different view of the law in this area, I respectfully dissent.
A.
To begin its analysis, the majority observes that employees are “presumptively entitled under Section 7 to wear union insignia and other attire during” work hours. Ante, at 570 (quoting Pathmark Stores, Inc. & Local 342-50, United Food and Commercial Workers Union, AFL-CIO (“Pathmark”), 342 NLRB 378, 379 (2004)). Although the majority seems to *581 unquestioningly accept this basic premise, I do not. As I shall discuss further below, I am willing to assume without deciding that such a presumption applies in this case (since Boch did not raise a challenge to it), but I feel compelled to comment on the silent, unexplained creep of the Board’s presumptions .and the resulting subtle, but consequential, shift in the burdens of litigation.
The “central purpose of the Act [is] to protect and facilitate employees’ opportunity to organize unions to represent them in collective-bargaining negotiations.” Am. Hosp. Ass’n v. NLRB, 499 U.S. 606, 609, 111 S.Ct. 1539, 113 L.Ed.2d 675 (1991). As the Supreme Court has long recognized, “the right of employees to self-organize and bargain collectively [under Section 7] necessarily encompasses the right effectively to communicate with one another regarding self-organization at the .jobsite.” Beth Israel Hosp. v. NLRB (“Beth Israel”), 437 U.S. 483, 491, 98 S.Ct. 2463, 57 L.Ed.2d 370 (1978) (emphasis added). At times, employees’ exercise of Section 7 rights in the workplace may come into conflict with their employer’s legitimate interest in controlling its property and operating its business. To balance the conflicting interests in such cases, the Board, with Supreme Court approval, has developed certain legal presumptions. See id. at 491-95, n.10, 98 S.Ct. 2463. One of these presumptions is the right to wear union-related paraphernalia while at work as a form of “concerted action,” Le., to communicate about self-organization rights or show support for a union. See Republic Aviation Corp. v. NLRB (“Republic Aviation”), 324 U.S. 793, 803-04, 65 S.Ct. 982, 89 L.Ed. 1372 (1945); Asociacion Hosp. del Maestro, Inc. v. NLRB (“Maestro”), 842 F.2d 575, 577 (1st Cir. 1988).
According to the Board’s more recent cases, this means that a restriction upon the right to wear such paraphernalia at work is presumptively unlawful, absent a showing of “special circumstances” by the employer to justify the imposition. See Starwood Hotels & Resorts Worldwide, Inc. (“Starwood”), 348 NLRB 372, 373 (2006). For example, an employer may restrict union insignia and apparel “when their display may jeopardize employee safety, damage machinery or products, exacerbate employee dissension, or unreasonably interfere with a public image that the employer has established, as part of its business plan, through appearance rules for its employees.” Bell-Atl.-Pa., Inc. (“Bell-Atlantic”), 339 NLRB 1084, 1086 (2003), enf'd sub nom., Commc’ns Workers of Am., Local 13000 v. NLRB, 99 Fed. Appx. 233 (D.C. Cir. 2004).
Note the difference, however, between the legal presumption sanctioned by the Supreme Court and the supposed right now read into Section 7 by the Board. The former recognizes a presumptive right to wear union-related paraphernalia while at work as a manifestation of employees’ right to communicate effectively regarding self-organization at the jobsite. The latter, on the other hand, holds as presumptively unlawful any restrictions upon the wearing of union-related paraphernalia, even during working hours or while the employee is on the job. This is a subtle, but undoubtedly significant, shift. As the Ninth Circuit has observed, while the “Supreme Court has held that the wearing of union buttons comes under the heading of ‘other concerted activities,’ ” it did not intend “to erect this into a rule which makes the wearing of union buttons per se a guaranteed right” at all times and in all places. NLRB v. Harrah’s Club (“Harrah’s”), 337 F.2d 177, 179 (9th Cir. 1964).
In the realm of workplace restrictions upon union solicitation, for example, there is an established rule that policies restrict *582 ing solicitation during nonworking time in nonworking areas are presumptively unlawful. In Beth Israel, the Supreme Court reviewed a workplace restriction upon off-hours solicitation in a hospital cafeteria. 437 U.S. at 486, 98 S.Ct. 2463. The Court noted that “patient use of the cafeteria, is voluntary, random, and infrequent,” and the Court found it “of critical significance that only 1.56% of the cafeteria’s patrons are patients.” Id. at 502, 98 S.Ct. 2463. Thus, the Court reaffirmed that the Board could find restrictions on employee solicitation during nonworking time in nonworking areas to be presumptively violative of Section 8(a)(1). See id. at 492-93, 508, 98 S.Ct. 2463.
The Court contrasted this presumption with that utilized “[i]n the case of retail marketing establishments, including public restaurants, ... [where] the Board has held that solicitation ... may be prohibited on the selling floor at all times.” Id. at 493, 98 S.Ct. 2463. The presumption flips because, “[i]n the retail marketing and restaurant industries, the primary purpose of the operation is to serve customers.” Id. at 506, 98 S.Ct. 2463. As such, a policy prohibiting solicitation on the selling floor is presumptively lawful because “solicitation in these areas, if disruptive, necessarily would directly and substantially interfere with the employer’s business.” Id.
These offsetting presumptions strike a reasoned balance between employers’ business prerogatives and employees’ labor rights.[19] Indeed, a prohibition tailored to employees who are on the clock and on the selling floor does not inappropriately suppress employees’ Section 7 rights, because “it would be an unusual store or restaurant which did not have stockrooms, kitchens, and other nonpublic areas” wherein “employee solicitation of nonworking employees” not only could be permitted, but “must be permitted.” Id. (emphasis added).
In the realm of workplace restrictions upon union insignia, most of the seminal ease law also reflects this logical and easily discernable line. For example, Republic Aviation, which is commonly cited for the presumptive right to wear union insignia absent special circumstances, dealt with a military-aircraft manufacturer. See 324 U.S. at 794, 65 S.Ct. 982. There, the Board applied a presumption that the button restriction at issue was unlawful and held that the employer had failed to demonstrate any evidence that wearing insignia had an adverse impact on the plant’s normal operations. See id. at 801-04, n. 7, 65-S.Ct. 982. Republic Aviation, however, dealt with an industrial business. The question of what presumption to apply to insignia restrictions for “public-facing” employees simply never arose.
The First Circuit’s treatment of insignia in Maestro also implicitly recognizes this distinction. In Maestro, we recognized that “employees have the right to wear union-related insignia,” but also recognized that “proscriptions against the wearing of union insignia in ‘immediate patient care areas’ are not presumptively invalid.” 842 F.2d at 577. The workplace policy in Maestro was fatally flawed because the hospital had “promulgat[ed] and enforc[ed] a rule prohibiting its employees from wearing union insignia in all places and at all times.” Id. *583 at 575 (emphases added). This blanket prohibition was a presumptively unfair labor practice absent identification of any “specific threat to patient care that wearing union insignia in nonpatient-care areas posed.” Id at 577 (emphasis added).
Only in recent years has this distinction eroded. In Starwood, for example, the Board held that a hotel did not violate Section 8(a)(1) when it prohibited an employee from wearing a union button in public areas and when it prohibited another employee from wearing union stickers in the hotel kitchen (a nonpublic area), but did violate Section 8(a)(1) by prohibiting an employee from wearing a union button in other nonpublic areas. 348 NLRB at 372. The Board’s explanation for these outcomes, however, strayed from the rule above. Rather than finding the ban presumptively lawful in public areas and presumptively unlawful in nonpublic areas, the Board presumed the ban was unlawful in all areas but then examined whether the hotel had shown “special circumstances” justifying the prohibition with respect to the public areas (he., an interest in its public image) and with respect to the nonpublic areas (he., an interest in food safety/sanitation). Id. at 373-76.
This new rule — -that employees possess a presumptive right to wear union insignia at all times and in all places — is not an exercise of the Board’s expertise or an application of the Board’s experience in applying the principle of accommodation to particular classes of circumstances or categories of rules. See Beth Israel, 437 U.S. at 492, 98 S.Ct. 2463 (“Accommodation -between [employee-organization rights and employer-property rights] must be obtained with as little destruction of one as is consistent with the maintenance of the other.” (alteration in original) (quoting NLRB v. Babcock & Wilcox Co., 351 U.S. 105, 112, 76 S.Ct. 679, 100 L.Ed. 975 (1956))). Rather, this “presumption” seems to be an abdication of the Board’s role to carefully balance employer and employee interests.[20]
*584 In this case, Boch’s dress code policy prohibited “employees who have contact with the public” from wearing “pins, insignias, or other message clothing.” Perhaps an employee would interpret the rule to apply to “employees who have contact with the public” even when they are not on the job. Perhaps Boch left too few opportunities for employees at the jobsite to communicate and organize off the clock and out of the public eye. These might constitute grounds for liability. In my view, however, the Board has not offered any explanation why a prohibition on insignia for public-facing employees who are on duty is presumptively unlawful under Section 8(a)(1) in this retail business.
Because Boch did not challenge the Board’s presumption, however, we must assume the policy is presumptively unlawful. The question then becomes whether Boch’s justifications for its prohibition on messaging attire constitute “special circumstances” and overcome the presumption. Here, too, I part ways with my colleagues in the majority..
B.
Even if Boch’s dress code policy were presumptively unlawful, I would hold that Boch has demonstrated “special circumstances” justifying its policy. That is because I believe that an employer can demonstrate special circumstances as a matter of law if the employer reasonably believes that a dress code will enhance its public image and the employer shows that it has maintained, and neutrally enforced, a clear and consistent dress code policy for public-facing employees who are on duty. See Burger King Corp. v. NLRB (“Burger King”), 725 F.2d 1053, 1055 (6th Cir. 1984); Harrah’s, 337 F.2d at 179.
The ALJ in this case recited the supposedly guiding precedent:
In determining whether an employer, in furtherance of its public image business objective, may lawfully prohibit uniformed employees who have contact with the public from wearing union insignia, the Board considers the appearance and message of the insignia to determine whether it reasonably may be deemed to interfere with the employer’s desired public image.
Boch Imports, 2015 WL 1956199, at *8 (quoting United Parcel Serv., 312 NLRB 596, 597 (1993)). The ALJ noted that “customer exposure to such insignia, alone, is not a special circumstance allowing the employer to prohibit such a display,” id. (citing Meijer, Inc., 318 NLRB 50 (1995)), and found that Boch’s “blanket prohibition” on messaging attire did not provide an opportunity to evaluate the “numerous factors that need to be weighed to determine whether a displayed item” threatens the employer’s interest in its public image, “including [the] size [of the item] and the message thereon,” id.
The Board affirmed the ALJ’s analysis, id., at *2, and now argues in its petition that an employer’s interest in its public image cannot constitute a “special circumstance” unless the employer demonstrates its deliberate cultivation of a particular image as part of its business plan and tailors the limitations to protect that image without overly impeding employees’ rights. See Bell-Atlantic, 339 NLRB at 1086.
The majority holds that the Board did not err in applying these precedents, ante, at 574, but fails to examine whether these precedents are coherent or tenable in the first place. One of the primary “prece *585 dents” cited by the ALJ, for example, was reversed, and the Board’s application for enforcement in that case was denied. See United Parcel Serv. v. NLRB, 41 F.3d 1068, 1073 (6th Cir. 1994).
To begin its analysis, the majority quickly disposes of the cases relied upon by Boch that deal with prohibitions on particular pieces of messaging attire. Ante, at 571-72. The majority is right to distinguish these eases;[21] however, in the process of doing so, the majority demonstrates precisely why a business like Boch might have legitimate reasons to adopt a broader dress code policy. That is because the Board’s precedents regarding more limited bans on provocative attire offer little solace to businesses that wish to maintain a decent image while minimizing exposure to labor law liability.
By tacitly encouraging employers to adopt narrower policies limited to offensive or controversial messages, the Board and the courts have lured businesses into a legal bog. Such policies cannot be administered in any kind of predictable or coherent manner. Employers must examine each t-shirt, button, sticker, or hat and make an on-the-spot judgment call, in each instance, about whether a particular message in a particular context has “crossed the line.” Thus, the employer risks liability every time human resources or in-house counsel draws that line (assuming the business can afford such experts) and bears the burden of proof to boot. And, of course, once that determination is made, employees are free to don a slightly altered piece of attire, leaving the employer in a quicksand of boundary-testing litigation.
The majority’s own examples prove the point. See ante, at 571-72, 572 n. 9. How “straightforward” of a message is too “straightforward”?[22] Can an employee swap out a slogan that “mocks” a company program with a more gentle parody?[23] If we replace a t-shirt depicting “employees as squashed and lying in a pool of blood” with one showing employees toiling under a heavy load, can it be worn on the selling floor over the employer’s objection?[24]
The Board acknowledges that its approach has led to cases “turn[ing] on fíne distinctions based on a balancing of respective statutory interests and on unique factual circumstances.” Bell-Atlantic, 339 NLRB at 1086. But the Board’s cases reveal a “standard” that is more subjective than anything else.
*586 [I]n United Parcel Service [I], the Board found that an employer could prohibit the wearing of a 2-1/2-inch conspicuous button worn on a uniform, but in United Parcel Service [II], the Board found that an employer could not prohibit the wearing of a small inconspicuous pin on a uniform. In Evergreen Nursing Home, the Board found that an employer could prohibit the wearing of a conspicuous bright-yellow 2-1/4-inch button worn by nurses in patient-care areas, but in St. Luke’s Hospital, the Board found that an employer could not prohibit the wearing of a 2-1/4-inch button with conspicuous white and black lettering in light of other patient-care circumstances. In Noah’s New York Bagels, the Board found that an employer could prohibit a phrase (added to company T-shirt) stating, “If it’s not Union, it’s not Kosher,” but in Escabana Paper Co., the Board found that an employer could not prohibit buttons stating “Just Say NO-Mead” and “Hey. Mead-Flex this.” In Southwestern Bell Telephone Co., the Board found that an employer could prohibit a shirt stating, “Ma Bell is a Cheap Mother” but in Borman’s Inc., the Board found that an employer could not prohibit a shirt stating, “I’m tired of bustin’ my ass” alongside company name.
Id. (internal citations omitted). Even a manager aware of these cases will have difficulty making a contemporaneous assessment when an employee shows up wearing a union button that is 2-1/4-inches wide (rather than 2-1/2-inches wide), is a slightly-less-conspicuous shade of mustard (rather than a conspicuous bright-yellow), and is inscribed with an edgy (but not quite provocative) slogan. Pick wrong, and the employer will be liable for a labor-rights violation. Pick right, and the employee may return the following day with a slightly smaller and darker button. To businesses seeking to avoid liability, and courts seeking to ascertain administrable rules, the Board’s standard is simply unworkable.
Next, the majority rejects Boch’s reliance on Starwood, which dealt with a hotel’s across-the-board ban on pins and other “adornments.” 348 NLRB at 372. According to the majority, the Board reasonably distinguished Starwood because the dress code in that case was meant “to create a specific and unique environment” and required employees to wear uniforms. Ante, at 573 (quoting Boch Imports, 2015 WL 1956199, at *2 n. 6). Specifically, servers wore “professionally-designed all-black shirt[s], slacks, and apron[s]” in order to create a “special atmosphere” for customers. Starwood, 348 NLRB at 373.
The majority argues that Boch, on the other hand, only sought to “cultivate a general, professional environment” and applied its insignia ban to all public-facing employees, even though some had to wear uniforms (service technicians and service advisors), some had to wear a shirt and tie or Boch Honda jersey (salespeople), and some had to wear “business casual” (administrative and financial staff). See ante, at 573, 573 n.ll.[25] Thus, in the majority’s *587 view, Boch’s desired public image was not “distinctive” enough and its “willing[ness] to tolerate ... more variation in dress” meant that it could not justify prohibiting “the additional increment of variation” that would be created by its non-uniformed employees wearing buttons and other messaging attire. Ante, at 573-74.
All of these arguments and points of distinction overlook one simple fact: none of this is the Board’s concern. By rubber-stamping the Board’s arbitrary infatuation with the uniqueness and uniformity of workplace dress codes, the majority has done little more than grant the Board the authority to play “fashion police.”
With respect 'to “uniqueness,” one might be left wondering why the Board has any authority whatsoever to second-guess Boch’s style choices or Boch’s judgment that its own customers will respond more favorably to a salesperson wearing a tie than a salesperson wearing a designer t-shirt. Starwood, 348 NLRB at 372 n. 4. The legality of a dress code cannot credibly turn on whether the employer thinks “business casual” befits its image, ante, at 573 n. 11, or whether the employer thinks a “professionally-designed all-black” outfit will do the trick, Starwood, 348 NLRB at 373. That decision is distinctly beyond the proper role of the Board. In fact, visitors to Boch Honda might be a bit perturbed if the company attempted to project a “trendy, distinct, and chic look.” Id. at 378. Yet, the majority seems untroubled by the suggestion that an employer’s interest in creating a “professional environment” deserves less respect than an employer’s interest in creating a “unique environment.” Ante, at 573. In my view, these are equally legitimate business objectives and the Board’s fixation on “distinctive” or “special” atmospheres is simply unsupportable.
Nor should the “uniformity” of an employer’s chosen dress code carry such dis-positive power. The majority makes much of the fact that salespeople and service technicians at Boch wear different outfits. See ante, at 573. But unless dealerships are required to put salespeople in coveralls or mechanics in ties (to preserve a “uniform” public image), I fail to see how Boch’s decision to tailor its dress code options to employees’ different roles poses any cause for concern.
According to the majority, once Boch opens the door to “business casual” and “tolerate[s] a fair amount [of] variation” in its dress code, Boch forfeits the ability to keep the door closed to “the additional increment of variation” caused by buttons and other messaging clothing. See ante, at 573-74. But all “increments of variation” are not created equal. Allowing employees to wear a variety of dress shirts will advance Boch’s chosen image; allowing employees to wear a variety of buttons and lanyards will undermine it.[26] Indeed, the majority’s increments-of-variation theory would hardly survive a real-world encounter with a wedding invitation: “dressy casual” may admit of variation, but there is a difference between inviting guests to take *588 off their ties and inviting guests to don pins protesting the bride’s choice of groom.
In short, the Board seems to imply that employers cannot prevent employees from bombarding customers with colorful and personalized proclamations on the job unless the employer is attempting to strike a gimmicky or novel tone through the use of completely homogeneous and inflexible uniforms.
Boch’s differentiated dress code requirements reflect its coherent, and reasonable, vision for a look that is professional and appropriate for a car dealership. As other circuits have recognized, the Board may “dra[w] on a fund of knowledge and expertise all its own,” but “that expertise is surely not at its peak in the realm of employer-customer relations.” Medco Health Solutions of Las Vegas, Inc. v. NLRB, 701 F.3d 710, 717 (D.C. Cir. 2012). The Board cannot honestly believe that an employer’s goal of creating and maintaining a reputation for professional service (both in style and substance) does not constitute a legitimate business interest.
Most business establishments ... try to project a certain type of image to the public. One of the most essential elements in that image is the appearance of its uniformed employees who furnish that service in person to customers.... [An employer] should not be required to wait until it receives complaints or suffers a decline in business to prove special circumstances. Businessmen are required to anticipate such occurrences and avoid them if they wish to remain in business. This is a valid exercise of business judgment, and it is' not the province of the Board or of this court to substitute its judgment for that of management so long as the exercise is reasonable and does not interfere with a protected purpose.
Harrah’s, 337 F.2d at 180 (footnote omitted).
I would instead follow the Sixth Circuit’s lead in Burger King and hold that an employer can demonstrate special circumstances as a matter of law if the employer reasonably believes that a dress code will enhance its public image and the employer shows that it has maintained, and neutrally enforced, a clear and consistent dress code policy for public-facing employees who are on duty. See Burger King, 725 F.2d at 1055; see also Harrah’s, 337 F.2d at 179. The majority rejects this approach for three reasons, none of which are persuasive.
First, the majority notes that Burger King has been “called into doubt by the very circuit that promulgated that decision.” Ante, at 574 n. 12 (citing Meijer, Inc. v. NLRB (“Meijer”), 130 F.3d 1209, 1215 (6th Cir. 1997)). In Meijer, the Sixth Circuit stepped away from the Burger King rule, arguing that the Burger King opinion “did not address, much less explain, how its holding can be reconciled with the Supreme Court’s dictate in Republic Aviation that employees have a presumptive right to wear union insignia, and that employers bear the affirmative burden of demonstrating special circumstances.” 130 F.3d at 1215.
Yet, the Burger King rule is easily reconcilable with Republic Aviation. Republic Aviation did not deal with public-facing employees. As such, the Burger King rule, which only applies where “employees have contact with the public,” 725 F.2d at 1055, would not apply to the facts of Republic Aviation on its own terms. An employer could not, for example, overcome the burden of proving “special circumstances” if its prohibition extended to nonworking times or non-public places. See Starwood, 348 NLRB at 374.
*589 Similarly, the employer would still shoulder the burden of showing that it did not apply its policy in a discriminatory or lackadaisical fashion. These are all prerequisites to the application of the Burger King rule. See Burger King, 725 F.2d at 1055 (noting that the challenged policy must be enforced in a “consistent and nondiscriminatory fashion”). In fact, the Mei-jer court could have applied Burger King to the facts of its own case and achieved the same result. The employer in Meijer only loosely enforced its policy until the union began organizing. 180 F.3d at 1211. Only then did the employer issue a “reminder” memorandum to employees and begin strictly enforcing its policy. Id.
Second, the majority notes that Burger King, like Harrah’s, dealt with “employees who were subject to a strict uniform policy as opposed to ... employees who were subject only to a basic dress code.” Ante, at 574 n. 12. As discussed above, however, the uniqueness or uniformity of the image that a company chooses to project to the public turns on “a valid exercise of business judgment, and it is not the province of the Board or of this court to substitute its judgment for that of management so long as the exercise is reasonable and does not interfere with a protected purpose.” Harrah’s, 337 F.2d at 180. Thus, to the extent the holdings in Burger King and Harrah’s only applied to “authorized uniforms,” I would extend the rule to encompass other clearly articulated dress code expectations such as those found in this case. See ante, at 587 n. 1.
Finally, the majority postulates that this approach “give[s] no weight to the competing concern that ... bans on protected activity that do not actually serve an employer’s claimed legitimate business interests would be imposed.” Ante, at 574 n. 13. Once one respects the boundary between the Board’s and the business s respective realms of expertise, however, this concern recedes. An employer’s reasonable belief that its image will benefit from a dress code is sufficient to show that a legitimate business interest exists.
This ensures that the Board’s presumption does not invade the proper province of an employer’s business judgment. Indeed, the problem with the Board’s approach is made quite plain by the record before us. For instance: What else, exactly, did Boch need to show in order to prove that its customers preferred a “professional environment” or that the dress code it adopted would further that image? Did Boch need to conduct focus group testing, run customer surveys, or retain a stylist to “prove up” its judgment that its employees will look more professional if they aren’t festooned in a smattering of random paraphernalia? I would hope not. S. New England Tel. Co. v. NLRB, 793 F.3d 93, 94 (D.C. Cir. 2015) (“Common sense sometimes matters in resolving legal disputes.”).
Applying a standard akin to that found in Burger King and Harrah’s, I think there is little question that Boch has demonstrated an interest in its public image sufficient to satisfy the special-circumstances exception. As in Harrah’s, the Board here attacked a “prohibition against all special adornments” that “only applied to employees coming in contact with the public” and “did not purport to prevent the wearing of buttons in nonworking time or in places not open to the public.” Harrah’s, 337 F.2d at 180. And there, as here, there was no evidence of unlawful purpose or discriminatory enforcement. Id. Because Boch reasonably believed that its public image would benefit from this dress code, I would hold that Boch has satisfied the special-circumstances exception.[27]
*590 In my view, the Board’s decision reflects a cavalier disregard for the legitimate prerogatives of those in the private sector and put an unreasonable evidentiary burden upon employers who decide that a professional-looking workforce will be good for business. Because the majority’s decision only compounds the Board’s arbitrary reasoning and erroneous interpretations of law, I respectfully dissent.[28]

. Member Johnson's warning that the Passa-vant factors should not be applied with "hyper-technical precision” is well taken nonetheless. Boch Imports, Inc., 362 NLRB No. 83, 2015 WL 1956199, at *6 (Apr. 30, 2015) (Johnson, dissenting). "[W]hat an employer must do to cure a violation may depend on the nature of the violation.” River's Bend, 350 NLRB at 193. This is because proportionality avoids, punishing cooperation. Otherwise, a company facing a dubious complaint over a somewhat-vague policy would have, to (1) declare a violation in stark 'terms (which would damage the company's reputation but provide little extra benefit or notice to employees), or (2) stand on the contested policy (which would vindicate the company but frustrate the purposes of the Act). The resources of the Board and the business alike are squandered in such situations.
Taxpayer funds are likewise misspent when the Board fails to advise a cooperating employer that litigation can be avoided through repudiation. Boch fully cooperated in the revision of its policies and was understandably surprised when the Board doggedly pursued liability nonetheless. It is true that Boch "did not reach an agreement with the Board” regarding repudiation, ante, at 570, but it appears that the Board did not even raise this issue until the final throes of litigation. If the Board actually values cooperation, there is little reason to litigate an expired policy without first simply asking the employer to post a repudiation notice. Only in the rarified air of appellate review could this argument be deemed, as my colleagues put it, a "non se-quitur.” Ante, at 570.

. Although "any ambiguity in [an employer's workplace policy] must be construed against the [employer] as the promulgator of the rule,” Lafayette Park Hotel, 326 NLRB 824, 828 (1998) enf'd 203 F.3d 52 (D.C. Cir. 1999), the Board traditionally has exhibited some skepticism about allowing ambiguity to form the basis for liability under the reasonably-construe standard, see ift at 827 (footnote omitted) (holding that a ban on employees "fraternizing” with guests on hotel property was not ambiguous despite the undefined term because "[e]mployees would recognize the legitimate business reasons for which such a rule was promulgated, and would not reasonably believe that it reaches Section 7 activity”). The Board's normal approach seems to be that ambiguity will not necessarily make a rule more likely to be construed as a restraint on Section 7 rights, see id., but that an employer cannot save itself from a rule that would reasonably be construed as •restrictive by relying upon ambiguity as a defense, see ifr at 828 (holding that a rule requiring employees to leave the "premises” immediately after the completion of their shift violated Section 8(a)(1) because employees would reasonably read the rule as covering parking areas and other outside areas despite respondent’s argument that it did not intend outside areas to fall within the scope of the term "premises”).

. The majority points out that "[w]e have no reason to resolve the issue, as this argument is neither one Boch itself made below nor is it one Boch makes in its petition to this Court.” Ante, at 568 n. 5. Certainly so. That is, of course, why I concur in the judgment with respect to Boch’s 2010 policies. But judges need not be silent bystanders to the misapplication of the law.

. See Republic Aviation, 324 U.S. at 803 n. 10, 65 S.Ct. 982 (“The Act, of course, does not prevent an employer from making and enforcing reasonable rules covering the conduct of employees on company time. Working time is for work. It is therefore within the province of an employer to promulgate and enforce a rule prohibiting union solicitation during working hours. Such a rule must be presumed to be valid in the absence of evidence that it was adopted for a discriminatory purpose.” (emphases added) (quoting Peyton Packing Co., Inc., 49 NLRB 828, 843 (1943))).

. The majority rides to the Board's rescue and argues that I have not explained why it would be unreasonable for the Board to apply different presumptions to solicitation and insignia. The majority then offers its own hypothetical explanations for the divergent treatment of solicitation and insignia. See ante, at 570-71 n. 7. This misses the point entirely.
The Board must justify using different presumptions for solicitation and insignia. Yet, instead of relying on its experience and expertise to explain the insignia presumption that it presently employs, the Board merely points to Republic Aviation and other such cases. These cases do not support the Board’s expansive interpretation, and the Board is not entitled to deference when it (mis)reads judicial decisions. If the Board would like to extend the presumption from Republic Aviation to include public-facing industries, then the Board — not the majority — must undertake an "appraisal of normal conditions [in service, rather than] industrial^] establishments” and adopt its new presumption after balancing the sector-wide interests of employers and employees. Republic Aviation, 324 U.S. at 804, 65 S.Ct. 982; see also Beth Israel, 437 U.S. at 506, 98 S.Ct. 2463 (noting that it is the Board’s role to formulate "rules [that] str[ike] the appropriate balance between organizational and employer rights in the particular industry to which each is applicable”) (emphasis added). The majority’s ruminations about why the Board might adopt different presumptions are irrelevant.
In fact, the majority's own speculative justifications only reinforce why it is important for the Board to base its presumptions on a real-world appraisal of costs and conditions. The majority theorizes that the "passive” wearing of insignia "obviously” does not divert employee time or intrude upon the workplace. Ante, at 570-71 n. 7. But experience has shown otherwise. The uncritical (and perhaps unwitting) expansion of the insignia presumption has led to an interminable string of vague and unpredictable cases over just when, where, and why messaging attire goes "too far.” See post, at 585-86. As these cases show, not only is it quite obvious that insignia can — and do — interfere with business, it is equally evident that the threats and burdens *584 of litigation in this area can adversely impact employer interests. These are the kinds of industry-wide realities that must be considered by the Board before adopting a new, broadened presumption.

.See Pathmark, 342 NLRB at 379 ("Respondent had no policy on uniforms and had permitted employees to wear other union insignia. ..Bell-Atlantic, 339 NLRB at 1085 ("Although employees do not wear uniforms and may wear T-shirts during working time, the Respondent’s apparel standards direct supervisors to be aware of 'disruptive appearance’ by employees....’’); id. at 1084 ("Respondent has historically permitted all of its employees represented by the Union to wear red union-sponsored T-shirts displaying the Union’s logo.”); S. New England Tel. Co. v. NLRB ("New England”), 793 F.3d 93, 97 (D.C. Cir. 2015) ("[T]he Board suggests that AT & T did not enforce its ban on unprofessional clothing in an evenhanded way....”).

. New England, 793 F.3d at 96-97 (invoking t-shirt's “straightforward” message and employer's consequently reasonable belief as to the impact of that message on customer relations).

. Medco Health Solutions of Las Vegas, Inc, v. NLRB, 701 F.3d 710, 717-18 (D.C. Cir. 2012) (concluding that employer satisfied its burden of establishing special circumstances to justify ban on particular t-shirt mocking company program).

. Bell-Atlantic, 339 NLRB at 1086 (concluding that employer satisfied burden of establishing special circumstances to justify ban on particular t-shirt "depicting employees as squashed and lying in a pool of blood”).

. More specifically, the policy stated that "[m]ale [non-uniformed] personnel [were] expected to wear dress shirts, dress slacks, and coordinated neckties” and "be mindful” that undershirts "not contain logos, wording, or designs which can be seen through a dress shirt.” “Female [non-uniformed] personnel [were] expected to wear blouses and skirts or dress slacks, dresses, or pant suits and hosiery” according to detailed specifications. For example, dresses and skirts were "not to be worn shorter than 2 inches above the knee,” heels were required to be "3 inches or shorter,” and blouses or shirts were required to have “a conservative neckline” and could not "be any shorter than the person’s waistline.” Such shirts were to be worn "with a sweater or blazer if they are strapless, sleeve *587 less, backless, or have very thin straps.” Both genders were prohibited from wearing "[fjlannel, leather, vinyl, denim, spandex or athletic-related clothing” or "athletic-type footwear.”

. My colleagues' question as to how "a small and unobtrusive - union pin” would interfere with a "professional environment,” ante, at 573, begs a further question: whether a slightly larger button with a pun about the company slogan would interfere with a "professional environment.” Once the clear and consistent policy is removed, Boch will be forced to engage in these subjective case-by-case evaluations, as discussed above.

. The majority claims that Boch "simply asserts, in conclusory fashion, that it is just like the employer in Starwood,” and so it cannot be saved by "newly presented arguments about how to make ... tradeoffs” in "workplace matters.” See ante, at 574, 574 n. 13. This is a misreading of Boch's petition, which clearly argues that the business is the proper arbiter of its own public image (by citing Medco and Harrah's) and that Boch has established "special circumstances" (by invoking the Burger King rule).

. Given my view that Boch’s "public image” interest justifies its dress code, I do not believe that Boch’s separate "safety and damage prevention" justification is required. Nonetheless, I believe that the Board unduly trivializes the risk that pins pose to the interiors, exteriors, and engines of the vehicles that are the lifeblood of Boch's business. Boch’s entire business revolves around selling and servicing vehicles, and it is eminently reasonable to employ precautionary measures. Perhaps, in an ideal world, salespeople and service technicians would remember to don and doff pins in precise correlation with tasks requiring vehicle contact. See ante, at 575. And perhaps, in this ideal world, administrative staff who do not "typically” have contact with vehicles would remember to remove their buttons on those occasions when they do. See ante, at 575. In such a world, the scope of Boch's policy would be indefensible. But we do not live in that world, and so I believe that Boch’s policy involves a reasonable preventive judgment.